## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**J.CLARK POLING,** in the capacity of successor co-trustee under the Will of Gladys S. Barclay, as a direct and successor intended beneficiary and as a vested and successor remainderman under the respective Wills of Isaiah & Gladys Barclay, husband and wife, deceased; **JOHN C. POLING**, in the capacity of successor co-trustee under the Will of Gladys S. Barclay, as a direct and successor intended beneficiary and as a vested and successor remainderman under the respective Wills of Isaiah & Gladys Barclay, husband and wife, deceased;

Plaintiffs,

vs.

**K. HOVNANIAN ENTERPRISES, INC.**, a Delaware Corporation; **ARA K. HOVNANIAN,** individually; **LEONARD COHEN**, a New Jersey Real Estate Broker; **TOLL BROTHERS INC.**, a Delaware Corporation; **MELLON BANK, N.A.**, (successors to Girard Trust Bank) a Pennsylvania Corporation; **PNC BANK CORPORATION**, (successors to Cranbury First National Bank) a Pennsylvania Corporation ; **CHAMBERLIN & BARCLAY, INC.**, a New Jersey Corporation,; **MILLSTREAM FARMS, INC.**, a New Jersey Corporation; **BARCLAY FARMS** and **BARCLAY BROTHERS PARTNERSHIPS,** New Jersey General Partnerships; **ESTATES OF ALBERT C. BARCLAY** and **MARION BARCLAY,** deceased, husband and wife and as former Barclay Brothers and Barclay Farms partners, ESTATE OF ALBERT C. BARCLAY in the capacity of former: Officer and Director of Chamberlin & Barclay, Inc., Trust Officer and Director of the First National Bank of Cranbury, New Jersey, and Attorney, Executor and Trustee under the Wills of Gladys S. Barclay and Isaiah D. Barclay; **FLORENCE B. WINSTON,** individually, in the capacity of surviving executrix of the Albert Barclay and Marion Barclay estates and in the capacity of a Barclay Brothers and Barclay Farms partner; **ROBERT**

Civil Case No.:

# 98-8670

Judge

# CIV-FERGUSON

Magistrate Judge

## MAGISTRATE JUDGE
## SNOW

### VERIFIED COMPLAINT

### DEMAND FOR JURY TRIAL

98 SEP 23 PM 1:46
CLERK U.S. DIST. CT.
S.D. OF FLA. - WPB
FILED BY ___ D.C.

1

WINSTON; CHARLES WINSTON;)
MARION WINSTON; ELIZABETH B.)
LIVINGSTON; LEE B. REIMANN; ALBERT)
BARCLAY III; MARGARET BARCLAY and)
ALBERT C. BARCLAY, JR., husband and)
wife and in the capacity of a Barclay Brothers)
and Barclay Farms partners; ALBERT C.)
BARCLAY, JR., ESQ., in the capacity of: (a))
an Attorney at Law in the State of New Jersey,)
(b) the surviving co-executor of the Albert)
Barclay and Marion Barclay estates, (c) the)
Limited Co-trustee of the Edward S. Barclay)
Trust, (d) the purported Managing Partner of)
BARCLAY FARMS and BARCLAY)
BROTHERS New Jersey General Partnerships,)
(e) the purported successor executor and former)
sole-trustee under the purported Last Will of)
GLADYS S. BARCLAY deceased, and, (f) as a)
Director of Chamberlin & Barclay, Inc.,;)
ESTATES OF E. STANLEY BARCLAY &)
ELINOR S. BARCLAY, deceased, husband and)
wife and as former Barclay Brothers and Barclay)
Farms partners, ESTATE OF E. STANLEY)
BARCLAY , as former: Officer and Director of)
Chamberlin & Barclay, Inc., and as a Trust)
Officer and Director of the First National Bank of)
Cranbury, New Jersey; EDWARD S.)
BARCLAY, JR., individually as a Barclay)
Farms partner, and as a Barclay Brothers partner)
in his capacity of trustee of the Edward S.)
Barclay Trust; SUSAN B. WALCOTT,)
individually as a Barclay Farms partner, and as a)
Barclay Brothers partner in her capacity of)
trustee of the Susan Walcott Trust; SUMMIT)
BANCORP., successor to United Jersey Bank, as)
corporate executor, co-trustee and custodian of)
the E. Stanley Barclay estate, the Edward S.)
Barclay Trust and the Susan B. Walcott Trust,)
and as a Barclay Brothers and Barclay Farms)
partner; WILLIAM S. BARCLAY and)
ELIZABETH M. BARCLAY , husband and)
wife and as Barclay Brothers and Barclay Farms)
partners, and WILLIAM S. BARCLAY in his)
capacity of : Officer and Director of Chamberlin)
& Barclay, Inc., Surviving Executor under the)
Will of Gladys S. Barclay and Director of the)

First National Bank of Cranbury, New Jersey; )
The **WILLIAM S. BARCLAY TRUST** under )
the Will of Isaiah D. Barclay,      WILLIAM S. )
BARCLAY and ELIZABETH M. BARCLAY )
Majority Co-trustees; **I. DAVID BARCLAY**, )
individually, as a Barclay Brothers and Barclay )
Farms partner and as Officer and Director of )
Chamberlin & Barclay, Inc.,; **ELLEN B.** )
**DEBLOIS**, individually, as Barclay Brothers and )
Barclay Farms partner and as Officer and )
Director of Chamberlin & Barclay, Inc.; )
The **LAW FIRM OF JACK HUFF & BILL** )
**MORAN,** attorneys at law in the State of New )
Jersey, in the capacity of attorneys for the Gladys )
S. Barclay Estate, as attorneys and directors of )
the bank formerly known as the First National )
Bank of Cranbury and as Cranbury Township )
Attorneys; **JACK HUFF**, individually; **BILL** )
**MORAN**, individually **JOHN DOES # 1-12;** )
                                                       )
                                                       )
                Defendants.                            )

## VERIFIED COMPLAINT

    **NOW COMES** the above-named plaintiffs, demanding trial by jury and bring this Verified

Complaint against the above-named defendants and state as follows:

## INTRODUCTION

    This is an action, inter alia, for declaratory and injunctive relief as well as compensatory and

punitive damages brought by the plaintiffs, J. Clark Poling and John C. Poling against the defendants

for their fraudulent and criminal actions against the plaintiffs and the Poling family trusts under the

Wills of Gladys and Isaiah D. Barclay, deceased. [1] Plaintiffs claims arise out of defendants'

---

[1] The original Isaiah D. Barclay estate was fractionalized by the corporate fiduciary pursuant to a testamentary formula between a marital deduction trust for the benefit of life beneficiary Gladys S. Barclay with full power of appointment rights, (if exercised, upon her subsequent death) and a residuary trust. Gladys S. Barclay had the benefit of the residuary trust income for life. Upon Gladys S. Barclay's death the corpus of the marital trust was appointed by will to her estate. The remainder of the residuary trust was to be divided pursuant to the terms of the trust agreement equally between Isaiah D. Barclay's surviving children, successor life beneficiaries, Elizabeth B. Poling and William S. Barclay. Plaintiffs are the grandchildren of the decedents and are entitled to take as direct beneficiaries and vested remaindermen, the whole of the corpus of the respective estates. ( See **EXHIBIT "1"** , **EXHIBIT "2"** and **EXHIBIT "3"** ).

participation in a continuing scheme to exercise illegitimate control of security interests held by fiduciaries for the benefit of plaintiffs and to continue extracting money from plaintiffs or their trust accounts under false and fraudulent pretenses using both the interstate mails and wire to do so. Defendants' have used their political clout to obstruct plaintiff's investigations and corrupt the normal processes of government at both the state and federal levels. Defendants' conduct violates 18 U.S.C. Section 1341 and 1342, and, as such, constitutes a "pattern of racketeering activity" under 18 U.S.C. Section 1961. As detailed herein, the injuries and damages suffered by plaintiffs were caused by fraudulent actions on part of the defendants which also constitute tortious and criminal conduct under the laws of the State of New Jersey, Pennsylvania and Florida.

## JURISDICTION AND VENUE

1.      Plaintiffs are individuals and each is, and at all times hereafter mentioned, domiciled in and a citizen of the State of Florida residing in the Southern District of Florida.

2.      Defendants are individuals, partnerships or corporations, and each is, and at all times hereafter mentioned either domiciled in or duly organized under the laws of the States of New Jersey, Delaware, Pennsylvania and North Carolina respectively, having their residences or principal places of business in the aforesaid states.

3.      This action is of a civil nature involving, exclusive of interest and costs, a sum in excess of $75,0000. Every issue of law, fact and equity in the action is wholly between plaintiffs who reside in and are citizens of states different from those in which defendants reside and of which they are citizens. Under 28 USCS §1332 and 28 U.S.C.S. §1343, this Court has original jurisdiction of this matter.

4.      Venue is properly laid in this district under Title 28, United States Code, Section 1391(a).

## THE PARTIES, INTERESTS AND RELATIONSHIPS

### PLAINTIFFS

5.      Brothers, J. CLARK POLING and JOHN C. POLING are the legal "issue" of Isaiah D. Barclay (deceased) and Gladys S. Barclay (deceased), husband and wife, who devised their respective estate property upon which this action is based through respective wills and trust agreements (hereinafter known collectively as the "decedents"). (EXHIBITS "1", "2" & "3" attached hereto are incorporated by reference into this complaint)

6.      J. CLARK POLING and JOHN C. POLING are persons interested as successor trustees and distributees of said decedents and of the trust property percentages which have been affected by the paper writings hereinafter mentioned including documents purporting to be the last wills and testaments, stock, partnership, deed and trust agreements of such decedents.

7.      Pursuant to Albert C. Barclay, Jr., sole-trustee's resignation and trustee and beneficiary successor agreements, plaintiffs, J. Clark Poling and John C. Poling are the successor co-trustees of the Elizabeth B. Poling spendthrift trust under the Will of Gladys S. Barclay. Legal Respective Addresses: 11025 138th Avenue, Fellsmere, FL 32948; 20882 Soneto Drive, Boca Raton, Florida 33433.

8.      Upon attaining the age of twenty-one years old, J. CLARK POLING, JOHN C. POLING, DANIEL L. POLING and DR. E. BARCLAY POLING were also direct and vested intended contingent remaindermen beneficiaries under trusts established by their grandfather, Isaiah D. Barclay.

9.      Today, as successor vested remaindermen beneficiaries, plaintiffs, J. Clark Poling, and John C. Poling are entitled to or represent in fiduciary capacities one hundred (100%) percent of

the whole of the divided residuary trust corpus upon the passing of life beneficiaries pursuant to the will, trust and transfer agreements between beneficiaries.

10.     As intended five (5%) percent direct beneficiaries under individual trusts established by their grandmother Gladys S. Barclay, and, as vested remaindermen under the purported Elizabeth B. Poling thirty-five (35%) percent trust allegedly established for their parents by their grandmother Gladys S. Barclay, the four Poling sons, J. CLARK POLING, JOHN C. POLING, DANIEL L. POLING and DR. E. BARCLAY POLING were  collectively entitled to fifty-five (55%) percent of the whole of the undivided estate corpus, including the appointed principal of the I. D. Barclay fractional share Marital Trust established for the benefit of his loving wife, Gladys S. Barclay.

11.     Today, two of the Poling sons, J. Clark Poling and John C. Poling are entitled to or represent in fiduciary capacities fifty-five (55%) percent of the whole of the undivided estate corpus, including the appointed principal of the I. D. Barclay fractional share Marital Trust upon the passing of life beneficiaries pursuant to the will, trust and subsequent transfer agreements between beneficiaries.

12.     Pursuant to the alleged Will, all Gladys S. Barclay individual trusts established for the benefit of the Poling sons, born respectively in 1952, 1955, 1958 and 1961,  partially terminated by one-third (1/3) upon each of the sons reaching the vesting ages of twenty-five (25) years old, thirty (30) years old and thirty-five (35) years old respectively. (See EXHIBIT "3")

13.     All of the Poling son's intended, individual beneficial trust rights, title and interests in trust property under the alleged Will of Gladys S. Barclay initially vested in 1977, 1980, 1983 and 1986 respectively.

14.   All Poling sons trusts under the alleged Will of Gladys S. Barclay fully terminated in 1987, 1990, 1993 and 1996 respectfully, pursuant to the terms of the trust agreement, subject only to subsequent transfer agreements between beneficiaries.

**DEFENDANTS**

15.   Defendant, **K. HOVNANIAN ENTERPRISES, INC.**, is a Delaware Corporation holding company with its principal place of business in New Jersey. K. Hovnanian Enterprises, Inc., through the actions of the following defendant subsidiaries and employees and in collusion with the defendants in this action, engaged in schemes to price fix and embezzle plaintiff's interest in the assets of the "enterprise" Barclay Brother's partnership using the U.S. mail and wires to do so. K. Hovnanian Enterprises, Inc., (hereinafter known as "Hovnanian") are principally engaged in the business of land acquisition and the development of single-family homes, townhouses and condominiums in planned residential communities in New Jersey, North Carolina, Pennsylvania, Florida, Virginia, New York and California:

> K. Hovnanian Companies
> K. Hovnanian Companies of New Jersey
> K. Hovnanian Companies of Central Jersey
> Najarian Associates
> Eastern Title
> Ara K. Hovnanian - President and C.E.O.
> Bruce Grosse - V.P. of Central Jersey Division
> Mitch Newman
> Edward Isrealow
> 10 Highway 35, P.O. Box 500
> Red Bank, New Jersey 07701;

16.   Defendant, **LEONARD COHEN**, a New Jersey Real Estate Broker representing the plaintiffs as sellers in a real estate transaction with Hovnanian and other defendants;

17.   Defendant, **TOLL BROTHERS INC.**, a Delaware Corporation. The defendant, developer and builder's employees and subsidiaries in collusion with the defendants in this action,

engaged in schemes to price fix and embezzle plaintiff's interests in the assets of the "enterprise" Barclay Brother's partnership using the U.S. mail and wires to do so.

18. Defendant, **MELLON BANK, N.A.**, a Pennsylvania Corporation (successors to Girard Trust Bank), Corporate Executors and Co-trustees under the Last Will and 1963 Trust Agreement of Isaiah D. Barclay, deceased. Defendant, Mellon Bank, N.A. is the surviving executor and corporate co-trustee of the Elizabeth B. Poling trust and William S. Barclay trust under the Will of Isaiah D. Barclay. Legal Affairs: Mellon Bank Center, 1735 Market Street, Philadelphia, PA 19103;

19. Defendant, **PNC BANK CORPORATION**, a Pennsylvania Corporation (successors to Midlantic Bank, N.A., and the First National Bank of Cranbury) Named Executor and Trustee under the purported Wills of Gladys S. Barclay, and Trustee holding shares in trust for the benefit of Chamberlin & Barclay Shareholders and heirs under the 1946 Chamberlin & Barclay, Inc., Stock Redemption Agreement. The First National Bank of Cranbury (PNC Bank) was the intended co-executor and co-trustee for the E. Barclay Poling Trust, the Daniel L. Poling Trust, the John C. Poling Trust and the J. Clark Poling Trust under the 1970 Will of Gladys S. Barclay. Defendant, First National Bank of Cranbury (PNC Bank) was the intended corporate co-trustee for the Elizabeth B. Poling Trust, the E. Barclay Poling Trust, the Daniel L. Poling Trust, the John C. Poling Trust and the J. Clark Poling Trust under the purported 1976 Will of Gladys S. Barclay. Legal Address: One PNC Plaza, Pittsburgh, PA 15222-2707;

20. Defendant, **ALBERT C. BARCLAY, JR.**, was the alleged successor executor and purported sole-trustee of the Elizabeth B. Poling Trust, the E. Barclay Poling Trust, the Daniel L. Poling Trust, the John C. Poling Trust and the J. Clark Poling Trust under the purported 1976 Will of Gladys S. Barclay until he resigned in December of 1997. Defendant, Albert C. Barclay, Jr., at

various times alleges: he is a co-tenant (who individually owns an undivided interest in all estate real estate under the Wills of Gladys S. Barclay and Isaiah D. Barclay); he is a General partner of Barcland Limited Partnership (where he individually controls a direct 33.33% undivided interest in all estate real estate included under the Wills of Gladys S. Barclay and Isaiah D. Barclay); he is sole trustee under the Will of Gladys S. Barclay (where he individually alleges and exercises 100% control over all estate property under the Will of Gladys S. Barclay); he is managing partner/ property manager of the partnership properties of Barclay Brothers and Barclay Farms, New Jersey general partnerships which interests of which have at various times been included in the estates of Isaiah & Gladys Barclay; he is an attorney-at-law in the State of New Jersey (where he alleges in his capacity of trust attorney under the Wills of Gladys S. Barclay (which he authored) and Isaiah D. Barclay that he has 100% legal representative control over all estate property); he is co-trustee with conflicting interests under the Will of E. Stanley Barclay (where he purports to control another 16.67% interest in the property included under the Wills of Gladys S. Barclay and Isaiah D. Barclay); and he is adverse legal counsel against his former clients (the Poling family) in a pending estate partition lawsuit MER-C-209-95 and condemnation lawsuit MER-L-001562-96 in which he represents the plaintiff's (Poling family) co-trustee Mellon Bank, NA under the Will of Isaiah D. Barclay and The William S. Barclay Trust as Mellon's and William S. Barclays's attorney against the equitable interests of the Poling family trusts in which he and Mellon Bank purport to be the (Poling family) sole trustee and corporate co-trustee respectively. Legal Address:  4444 route 27 (45 Main St) Box 706 Kingston, New Jersey 08528;

21.     Defendant, **CHAMBERLIN & BARCLAY, INC.**, a New Jersey Corporation, as Trustee holding a large percentage of Millstream Farms, Inc., a New Jersey Corporation (land holding company) and other undisclosed trust assets in trust for the benefit of the Life and Remainder

Beneficiaries under the Last Will and Trust Agreements of Isaiah D. Barclay, deceased and Gladys S. Barclay, deceased; MELLON BANK, N.A., WILLIAM S. BARCLAY, , as Officers and Directors of Chamberlin & Barclay, Inc.. Legal Address: Cranbury Station Road, Cranbury, NJ 08512;

22.     Defendant, **BARCLAY FARMS**  and **BARCLAY BROTHERS PARTNERSHIPS,** New Jersey General  Partnerships, 4444 route 27 (45 Main St) Box 706 Kingston, New Jersey 08528;

23.     Defendant, **ESTATES OF ALBERT C. BARCLAY** and **MARION BARCLAY**, deceased, husband and wife and as original Barclay Brothers and Barclay Farms partners, ESTATE OF ALBERT C. BARCLAY  in the capacity of former: Officer and Director of Chamberlin & Barclay, Inc.,  Trust Officer and Director of the First National Bank of Cranbury, New Jersey, and Attorney, Executor and Trustee under the Wills of Gladys S. Barclay and Isaiah D. Barclay, c/o Albert C. Barclay, Jr., Esq., 4444 route 27 (45 Main St) Box 706 Kingston, New Jersey 08528;

24.     Defendants, **FLORENCE B. WINSTON, ROBERT WINSTON; CHARLES WINSTON; MARION WINSTON; ELIZABETH B. LIVINGSTON; LEE B. REIMANN;** and **ALBERT BARCLAY III** in the capacity of a Barclay Brothers and Barclay Farms partners;

25.     Defendant, **MARGARET BARCLAY** and **ALBERT C. BARCLAY,  JR.**, husband and wife and in the capacity of a Barclay Brothers and Barclay Farms partners, c/o Albert C. Barclay, Jr., Esq., 4444 route 27 (45 Main St) Box 706 Kingston, New Jersey 08528;

26.     Defendant, **EDWARD S. BARCLAY, JR.**, individually, as a Barclay Farms partner and as a Barclay Brothers  partner in the capacity of  trustee of the Edward S. Barclay Trust.

27.     Defendant, **SUSAN  B. WALCOTT,** individually, as a Barclay Farms partner and as a Barclay Brothers  partner in the capacity of  trustee of the Susan B. Walcott Trust.* [2]

---

[2] Susan B. Walcott and her son James Walcott have voluntarily attempted to mitigate damages to the Poling family by providing plaintiffs in this case with billing statements, phone records, deeds, Chamberlin & Barclay Inc., 1946 Stockholders Agreements and letters,  all integral  pieces of evidence forming the foundation for plaintiffs RICO claims

28.     Defendant, **WILLIAM S. BARCLAY TRUST** under the Will of Isaiah D. Barclay, WILLIAM S. BARCLAY and ELIZABETH M. BARCLAY Majority Co-trustees and life beneficiaries. Legal Addresses: Mellon Bank Center, 1735 Market Street, Philadelphia, PA 19103; Co-trustees - William S. Barclay, 32 George Davison Road, Cranbury, NJ 08512; Contingent Remaindermen - I. DAVID BARCLAY, 176 Conover Road, Trenton, NJ 08691; and   ELLEN (BARCLAY) DEBLOIS, 136 N. Main Street, Cranbury, NJ 08512;

29.     Defendant, **WILLIAM S. BARCLAY**, Individually, as life beneficiary under the trust established by his father Isaiah D. Barclay, as Officer and Director of Chamberlin & Barclay, Inc., as Executor under the Will of Gladys S. Barclay, as a Director of the First National Bank of Cranbury, New Jersey as a Barclay Farms partner and as a Barclay Brothers  partner in the capacity of  trustee of the William S. Barclay Trust under the will of I.D. Barclay. Legal Address: William S. Barclay, 32 George Davison Road, Cranbury, NJ 08512;

30.     Defendant, **I. DAVID BARCLAY** individually, as a Barclay Brothers and Barclay Farms partner and as Officer and Director of Chamberlin & Barclay, Inc.;

31.     Defendant, **ELLEN B. DEBLOIS**; individually, as a Barclay Brothers and Barclay Farms partner and as Officer and Director of Chamberlin & Barclay, Inc.;

32.     The **LAW FIRM OF JACK HUFF & BILL MORAN,** attorneys at law in the State of New Jersey, in the capacity of attorneys for the Gladys S. Barclay Estate, as attorneys and directors of the bank formerly known as the First National Bank of Cranbury and as Cranbury Township Attorneys; **JACK HUFF**, individually; **BILL MORAN**, individually;

33.     Defendants, **JOHN DOES # 1-12** may be jointly and severally liable in this action, to

---

against the other defendants in this action. Plaintiffs could never have discovered  or secured these documents left to their own devices.

be determined by further investigation and discovery. Plaintiffs reserve their right to amend their complaint for inclusion of newly discovered facts, claims and parties.

## COUNT I:

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (18 UNITED STATES CODE SECTION 1962(a), (b), (c), and (d))

34.     Plaintiffs hereby incorporate by reference J. Clark Poling's October 27, 1997 & July 27, 1998 Affidavits attached as EXHIBIT's "4" & "5" respectively and repeat and reallege the allegations contained in paragraphs 1 through 33, inclusive.

35.     COUNT I is brought by all plaintiffs against all defendants.

## THE BARCLAY BROTHERS INVESTIGATION

36.     After discovering a copy of a Barclay Brothers "partition by contract of sale to Hovnanian" lawsuit in January of 1996, plaintiff, J. Clark Poling  first became  suspicious of the actions of respective defendants and his fiduciaries, Albert Barclay, Jr., and Mellon Bank and their joint determination via partition complaint, of  the Poling family real property trust percentages which said defendants did verify to the court in a pending partition action against the plaintiffs herein, No. MER-C-209-95.

37.     After it was discovered that the aforesaid adversarial partition case was jointly verified and  filed against the Poling family by defendant fiduciaries, Albert Barclay, Jr., and Mellon Bank , in direct contravention of an arbitration agreement, plaintiff, J. Clark Poling directly questioned the motives of  the Poling family trust's purported sole trustee, Albert Barclay, Jr., under the Will of Gladys S. Barclay, and his  conflicting fee representation of  the Poling family trust's sole corporate trustee, Mellon Bank, under the Will of Isaiah D. Barclay, which representation was wholly conflicting and  adverse to all the  Poling family wishes and interests.

38.   Both defendants, Albert Barclay, Jr., and Mellon Bank were notified by mail of the potential to breach contracts and their respective duties of impartiality owed to the Poling family and trust conflicts of interest and ethical violations they would be subject to while continuing to knowingly act and/or to knowingly allow fiduciaries to act in the dual capacity of Poling family trustee and as attorney at law for direct Poling family adversaries; Mellon Bank, William S. Barclay and Barcland Limited partnership. They both failed and refused to respond.

39.   Additionally, initially it was discovered that defendant, Albert C. Barclay, Jr., was the alleged general controlling partner of Barcland Limited, a purported New Jersey limited partnership which allegedly held a 33.33% ownership stake in the Chamberlin Farm, that Albert C. Barclay, Jr., was the court-ordered co-trustee of the Edward S. Barclay trust, which allegedly held a 16.67% stake in the Chamberlin Farm and that Albert Barclay, Jr., and his family also allegedly owned a personal stake in the Chamberlin Farm which was the only known marketable asset of the Poling family respective trusts and the subject matter of the partition by contract sale to Hovnanian action.

40.   Furthermore, it was discovered that defendant, Albert Barclay, Jr., previously represented the Poling family as an attorney at law before proceeding in the partition by contract sale to Hovnanian action. As an officer of the court and under the penalties of perjury, defendant, Albert Barclay, Jr., in the furtherance of his schemes, denied any previous representation of the Poling family to the court. Since that date he has used the proprietary information attained while previously representing the Poling family interests against the Poling family in court and for the benefit of his new clients with interests wholly adverse to the interests of the Poling family.

41.   Finally, it was discovered that defendant, Albert Barclay, Jr., contrary to representations and admissions in court of a co-tenancy, attempted to serve himself as the purported managing partner of Barclay Brothers partnership, the purported owner of the Chamberlin Farm, for

the entire Poling family. After allegedly perfecting service on the Poling family via service upon himself he defaulted the Poling family "owners" of the Chamberlin Farm.

42.     Superior Court Judge Samuel D. Lennox was notified of the abusive conflicts and a bar complaint against defendant, Albert Barclay, Jr., was timely filed and is still pending subject to the cessation of pending litigation.

43.     Judge Lennox subsequently admonished Albert Barclay, Jr., set aside the defaults against the Poling family and removed defendant, Albert Barclay, Jr., as the sole trustee of the Poling family trusts under the Will of Gladys S. Barclay and appointed a trustee ad litem.

44.     Prior to commencing this action, plaintiff, J. Clark Poling , following his own suspicions as noted above and under an open Court directive from the Honorable Judge Lennox, did search Mercer and Middlesex County deed records and respective court records and repeatedly requested all trust documents from the respective fiduciaries.

45.     Plaintiffs have only recently discovered the true facts contained in the following allegations and counts due to the fact that the Poling family sole corporate fiduciary and record holder, under the Will of Isaiah D. Barclay,  Mellon Bank, acted in concert with the Poling family sole trustee under the Will of Gladys S. Barclay and Mellon Bank's legal counsel, Albert Barclay, Jr., to block all discovery attempts of  the Poling family.

46.     Defendant, Albert Barclay, Jr., in his capacity of an attorney representing defendant, William S. Barclay and defendant, Mellon Bank successfully opposed a pro-se Poling family motion to compel discovery before New Jersey Superior Court Judge, Samuel  Lennox by affirmatively stating as an officer of the court, to the Judge, under the penalties of perjury that all trust documents for both the Isaiah D. Barclay and Gladys S. Barclay estates were routinely destroyed after  ten years, therefore they do not exist today.

47.    In late-May of 1997, plaintiff's mother, Elizabeth B. Poling was forced to sell her homestead of almost fifty-years. While having her father's (Isaiah D. Barclay) personal dresser moved over a second story porch railing, the back veneer of the "antique" dresser caught on the deck railing popping part of the back veneer panel off. Out of the back of the dresser fell two large envelopes with over twenty-years of personal financial "black books", letters and original Chamberlin & Barclay, Inc., minutes, lawyer's letters and stock agreements dating back to 1927.

48.    After another year of intensive investigation, and after discovering memorandums from Mellon Bank's head corporate counsel admitting trust percentage discrepancies in favor of the Elizabeth B. Poling trust, plaintiff, J. Clark Poling confronted Mellon Bank's CEO and CFO in Pittsburgh, Pennsylvania with the facts he had discovered, and on May 14, 1998 all trust documents held by Mellon Bank as corporate trustee dating back to 1968 were presented for inspection and copying by the J. Clark Poling at Mellon Bank's offices in Philadelphia, Pennsylvania. So many documents existed that were relevant to the investigation that it took Mellon Bank trust officers until June 2, 1998 to copy and fed-x the balance of the trust records to the Poling family.

49.    Plaintiff, J. Clark Poling discovered that the 1946 Chamberlin & Barclay Stock Redemption trust asset agreement was not in the Isaiah D. Barclay estate file presented for inspection and copying on May 14, 1998.

50.    Plaintiff, J. Clark Poling discovered that no final adjudication was ever entered by the probate court in the matter of the security interest known as Chamberlin & Barclay, Inc., stock.  After reviewing the first and final accounting and other documents presented by Mellon Bank on May 14, 1998, plaintiff J. Clark Poling affirmatively alleges that the value of the largest single estate asset, Chamberlin & Barclay stock  was fraudulently determined or never determined by the probate court. No amended accountings were ever filed or adjudicated in the probate court.

51.     Additionally, plaintiff, J. Clark Poling discovered that after Chamberlin & Barclay stock was listed as "undetermined" in the final accounting to settle the estate in the probate court in 1972, no proof of service or notice regarding the probate of the Wills of Isaiah D. Barclay or Gladys S. Barclay exists to a guardian ad litem for legal minor and direct beneficiary of the J. Clark Poling trust, plaintiff, J. Clark Poling.

52.     In the Matter of the Estate of Gladys S. Barclay, plaintiff J. Clark Poling discovered that no Poling direct beneficiary of the individual trusts for the grandchildren, including minor beneficiaries were served with or noticed regarding a will contest action and alleged 1978 consent judgment purporting to adjudicate their respective rights regarding the "undetermined" or fraudulently determined Chamberlin & Barclay stock and other purported matters.

53.     No Poling grandchild had knowledge of the 1978 will contest proceedings.

54.     No Poling grandchild was given the opportunity to retain legal counsel.

55.     Plaintiff, J. Clark Poling discovered that  the court did not appoint a guardian for the benefit of the non-represented Poling grandchildren, yet in the record on file with the probate court, counter-plaintiff Albert Barclay and Albert Barclay, Jr.'s attorney of record, Convery & Convery clearly signed the consent judgment as attorney for the Poling grandchildren in a scheme to make it appear that the Poling grandchildren were represented.

56.     Plaintiff, J. Clark Poling has demanded all trust documents and an accounting from defendant, surviving co-executor and deposed trustee, Albert Barclay, Jr., continuously since early 1996 but he has failed and refused to turn over one document to date.

57.     Plaintiff, J. Clark Poling has since discovered that defendant, Albert Barclay, Jr., in December of 1997, without court approval, without disclosure to, or authorization  from direct and vested beneficiaries, and without approval of the trustee ad litem , did convert at least $10,000.00 or

more of the remaining $20,000.00 liquid corpus of the Elizabeth B. Poling trust under the Will of Gladys S. Barclay, in his sole control, for his personal benefit after he resigned his trusteeship pursuant to a previously executed co-trustee successor agreement.

58.     Furthermore, plaintiff, J. Clark Poling discovered suspicious signatures in said probate court file purporting to be the signatures of respective Poling grandchildren allegedly waiving their rights to their interests in Chamberlin & Barclay stock which have been shown to the respective grandchildren and which have been refuted by plaintiffs herein as abject forgeries.

59.     Plaintiff, J. Clark Poling affirmatively alleges that the Poling family could never have discovered the true facts concerning the express trust breach of the 1946 Chamberlin & Barclay Stock Redemption trust asset agreement and scheme to defraud, or the many other hidden non-appraised trust assets which were embezzled and laundered through the close corporation and diverted to the William S. Barclay family unless the grandson of Isaiah D. Barclay's brother, James Walcott had first forwarded the only known copy of the 1946 Chamberlin & Barclay, Inc., Stockholders Agreement and subsequent letters to Isaiah D. Barclay's grandson, and plaintiff, J. Clark Poling, over one-year ago.

60.     Plaintiff, J. Clark Poling never understood the true significance of the "1946 Agreement" forwarded to him by James Walcott until he uncovered the final links to the puzzle in Mellon Bank's thirty-year old trust file on May 14, 1998. At that point, holding conclusive proof of a pattern of pervasive fraud he was duty bound in his fiduciary capacity of successor co-trustee under the Will of Gladys S. Barclay to file this case and record his conclusive findings of his investigation by way of affidavit to the proper authorities for criminal prosecution.

61.     On September 20, 1998, plaintiffs determined for the first time, from substantial and credible evidence discovered from the "Mellon Files", cross-referenced with other investigative

documents and New Jersey Statutes that the "Chamberlin Farm", "Major Farm" and "Tantum Farm" were and are assets of the respective New Jersey general partnerships known as Barclay Brothers and Barclay Farms. Plaintiffs interests in the respective farms, by law, must be considered personalty rather than realty. Defendants in this case knew the true facts regarding these farms but have participated in a continuing scheme to exercise illegitimate control of the partnership interests held by fiduciaries for the benefit of plaintiffs so they could continue extracting money from plaintiffs or their trust accounts under false and fraudulent pretenses using both the interstate mails and wire to do so.

62.     Plaintiffs have presented numerous settlement offers to liable parties but all defendants have ignored and refused to make the Poling family whole.

## INTRODUCTORY FACTUAL ALLEGATIONS COMMON TO EACH CLAIM FOR RELIEF

### KEY DATES:

65.     December 5, 1944- Barclay Farms Partnership formed, partner, Isaiah D. Barclay, 1/6, puts up $3,000 and signs three demand notes for $2,666.66 each @ 2 1/4% interest payable to Ezekiel S. Barclay for the purchase of the Major, Tantum and two Magnani farms on account of Barclay Farms Partnership for a total purchase price of $66,000. Co-owners and partners, Gladys S. Barclay, 1/6, Albert C. Barclay, 1/6, Marion T. Barclay 1/6, E. Stanley Barclay, 1/6 and Elinor S. Barclay, 1/6 each put up $3,000 and sign three demand notes each for $2,666.66. The Major, Tantum and two Magnani farms were brought into the Barclay Farms Partnership stock by the co-owners as specific partnership property held as tenants in partnership.

66.     January, 1945 - Barclay Farms Income, gross - $16,358, net - $6,714.

67.     December 17, 1945 - Ezekiel S. Barclay, as an early Christmas present, retired one note of $2,666.66 each,   for each of the respective Barclay Farms partners concluding the indebtedness incurred by the partners as a result of the December 5, 1944 sale and purchase.

68.     January, 1946 - Barclay Farms Income, gross - $29,123, net - $15,061.

69.     December 16, 1946 - Chamberlin & Barclay, Inc., Stock Redemption Agreement signed by Ezekiel S. Barclay, Lizzie C. Barclay, Albert C. Barclay, Marion Barclay, E. Stanley Barclay, Elinor Barclay, Isaiah D. Barclay and Gladys S. Barclay among others and notarized.

70.     January, 1947 - Barclay Farms Income, gross - $32,929, net - $16,638.

71.     December 12, 1947 - Barclay Brothers Partnership formed, Isaiah D. Barclay 1/6 puts up $2,500, Gladys S. Barclay 1/6 puts up $2,500 as do the rest of the partners, Albert C. Barclay, 1/6, Marion T. Barclay 1/6, E. Stanley Barclay, 1/6 and Elinor S. Barclay, 1/6.

72.     December, 1948 - All Barclay Farms partners and all Barclay Brothers partners agree to allow Chamberlin & Barclay, Inc., to take in partnership checks on the accounts of Barclay Farms and Barclay Brothers and the partners appoint Chamberlin & Barclay the trustee of the accounts.

73.     January, 1948 - Isaiah D. Barclay elected President of First National Bank of Cranbury.

74.     January, 1949 - Chamberlin & Barclay dividends paid. Isaiah D. Barclay - $4,250, Gladys S. Barclay - $2,500. Sales - $776,000, net profit - $105,000.

75.     January 1950 - Chamberlin & Barclay dividends paid. Isaiah D. Barclay - $4,330, Gladys S. Barclay - $2,580. Sales - $795,000, net profit - $107,000.

76.     January 1951 - Chamberlin & Barclay dividends paid. Isaiah D. Barclay - $4,330, Gladys S. Barclay - $2,580. sales - $658,000, net profit - $91,000.

77.     January 1952 - Chamberlin & Barclay dividends paid. Isaiah D. Barclay - $4,330, Gladys S. Barclay - $2,580. sales - $829,000, net profit - $114,000.

78.  <u>January 12, 1952</u> - Elizabeth C. Barclay, daughter of Gladys & Isaiah Barclay marries Edward L. Poling. Edward L. Poling begins working at Chamberlin & Barclay, the family close corporation.

79.  <u>September 8, 1952</u> - E. Barclay Poling, grandson of Isaiah and Gladys Barclay is born.

80.  <u>August 17, 1953</u> - Lizzie Chamberlin Barclay, mother of  Isaiah D. Barclay, Albert C. Barclay  and E. Stanley Barclay dies. She devises the "Chamberlin" farm and "Coward Farm" in equal parts to her three sons by will.

81.  <u>January, 1954</u> - Barclay Brothers Partners, Isaiah D. Barclay, Albert C. Barclay and E. Stanley Barclay agree to bring the 'Chamberlin Farm" and "Coward Farm" into the Barclay Brothers Partnership stock as specific partnership property holding as co-owners with the other partners and as tenants in partnership.

82.  <u>January, 1954</u> - Chamberlin & Barclay dividends paid. Isaiah D. Barclay - $4,610, Gladys S. Barclay - $2,730.

83.  <u>January 1, 1955</u> - Ezekiel S. Barclay, President of Chamberlin & Barclay, Inc., former President of the First National Bank of Cranbury and father of  Isaiah D. Barclay, Albert C. Barclay and E. Stanley Barclay dies.

84.  <u>January 7, 1955</u> - Isaiah D. Barclay was elected President and Treasurer of Chamberlin & Barclay, Inc., Albert C. Barclay was elected Vice President and E. Stanley Barclay was elected Executive Vice President and Secretary.

85.  <u>September 5, 1955</u> - Daniel L. Poling, grandson of Isaiah and Gladys Barclay is born.

86.  <u>January, 1957</u> - Chamberlin & Barclay, Inc., Book Value - $578.00.

87.  <u>January 12, 1957</u> - Chamberlin & Barclay dividends paid @ $12.50/share, Isaiah D. Barclay - $5,762.50 Gladys S. Barclay - $3,412.50.

88.     <u>January, 1958</u> - Chamberlin & Barclay, Inc., Book Value - $666.56/share.

89.     <u>May 1, 1958</u> - John C. Poling, grandson of Isaiah and Gladys Barclay is born.

90.     <u>January, 1959</u> - Chamberlin & Barclay dividends paid @ $12.50/share, Isaiah D. Barclay - $5,762.50 Gladys S. Barclay - $3,412.50.

91.     <u>March 15, 1959</u> - Elizabeth Barclay Poling hospitalized.

92.     <u>March, 1959</u> - Isaiah D. Barclay owns 12.2% of all outstanding shares of Cranbury First National Bank stock, Gladys S. Barclay owns 4.3%.

93.     <u>September 15, 1960</u> - Isaiah D. Barclay has a meeting with Girard Trust Vice President, Blackman. They discussed Master tax Guide Section 303 and the Chamberlin & Barclay 1946 Stockholders Agreement. Blackman advises; " If sell corp. - no agreements."

94.     <u>January, 1961</u> - Chamberlin & Barclay, Inc., Book Value - $927,289.94 or $684.85/share with 1354 shares outstanding.

95.     <u>January 12, 1961</u> - Barclay Brothers partners, Isaiah D. Barclay 1/6, Gladys S. Barclay 1/6, Albert C. Barclay, 1/6, Marion T. Barclay 1/6, E. Stanley Barclay, 1/6 and Elinor S. Barclay, 1/6 agree to sell part of their co-owned partnership property known as the Coward Farm to McGraw Hill, Inc., for $60,093.33. All partners equally divide the proceeds of the sale.

96.     <u>June 7, 1961</u> - J. Clark Poling, grandson of Isaiah and Gladys Barclay is born.

97.     <u>December 29, 1961</u> - Barclay Brothers partners, Isaiah D. Barclay 1/6, Gladys S. Barclay 1/6, Albert C. Barclay, 1/6, Marion T. Barclay 1/6, E. Stanley Barclay, 1/6 and Elinor S. Barclay, 1/6 agree to sell part of their co-owned partnership property known as the Chamberlin Farm to McGraw Hill, Inc., for $19,290.67. All partners equally divide the proceeds of the sale.

98.     <u>January, 1962</u> - Chamberlin & Barclay, Inc., Book Value - $1,100,000 or $812.41/share with 1354 shares outstanding. Net Value - $1,308,000 or $966.03/ share.

99.   January, 1963  - Chamberlin & Barclay, Inc., Book Value - $1,100,000 or $812.41/share with 1354 shares outstanding. Net Value - $1,308,000 or $966.03/ share. Building value - $352,000. President, Isaiah D. Barclay's salary - $44,840.

100.   February 28, 1963 - Isaiah D. Barclay bought the 134 acre Perrine Farm in West Windsor, New Jersey with Earnest Tark and Jack Satterwaite for $112,500. By way of incorporation they brought the property into Millstream Farms, Inc., a New Jersey corporation. They each put up $20,000 in cash and took out a first mortgage with the First National Bank of Cranbury for $60,000. They each held stock in the corporation representing a 33.33% interest in the property. They itemized the purchase price as paying $90,000 for the land, $19,000 for the potato storage  and $4,000 for the wheat crop. Chamberlin & Barclay, Inc., rented out the storage from Jack Satterwaite and Isaiah D. Barclay for $2,000/ year.

101.   May 27, 1963 - Isaiah D. Barclay executed a will and revocable inter vivos life insurance trust agreement naming Girard Trust Bank or successors "Mellon Bank" and Gladys S. Barclay, his wife as co-executors and co-trustees.

102.   January, 1964 - Chamberlin & Barclay, Inc., is the named trustee for Isaiah D. Barclay and Gladys S. Barclay's respective interests in the A. Perrine Field, Millstream Farms, Inc., the Gas Station property, the  Diner property, a share in the Tindall - Weedin farm partnership, the Barclay Farms partnership and the Barclay Brothers partnership.

103.   January, 1964 - Isaiah D. Barclay's individual stock portfolio is worth $957,000 and his bond portfolio is valued @ $202,000. Gladys S. Barclay's individual stock portfolio is valued @ $382,000. The value of Isaiah's 461 shares and Glady's 273 shares of Chamberlin & Barclay, Inc., stock is not included in this valuation.

104.   October 1, 1964 - Isaiah D. Barclay and Gladys S. Barclay purchase Gloria Chamberlin's farm corner of aprox. 5 acres for $10,500.  Previously on 4/16/43 they purchased the contiguous Applegate farm for $19,000 and on 10/15/46 they purchased the Malan farm for $14,000.

105.   January, 1965 - Albert C. Barclay and E. Stanley Barclay were elected to the Trust Committee as Directors of the First National Bank of Cranbury.

106.   January, 1965 - Edward L. Poling secures Wise Potato Chip contracts and Frito-Lay Potato Chip contracts in the amount of $310,726 for Chamberlin & Barclay, Inc..

107.   March 1, 1965 - Isaiah D. Barclay hospitalized with a heart attack. He was released from the hospital on March 21, 1965.

108.   April 11, 1965 - Isaiah D. Barclay's individual stock portfolio is worth $1.043.230 and his bond portfolio is valued @ $157,000. Gladys S. Barclay's individual stock portfolio is valued @ $400,390. The value of Isaiah's 461 shares and Glady's 273 shares of Chamberlin & Barclay, Inc., stock is not included in this valuation.

109.   April 22, 1965 - Isaiah D. Barclay has a meeting with Girard Trust Vice President, Blackman.

110.   October 4, 1965 - Isaiah D. Barclay executes an installment sales agreement to buy 235 shares of Albert & Marion Barclay's Chamberlin & Barclay stock for $200,00 in contravention of the 1946 Stockholders Agreement. Trustee, the First National Bank of Cranbury terminates the 1946 Stockholders Agreement and releases all shares of stock without investigation.

111.   October 29, 1965 - E. Stanley & Elinor Barclay registered letter written to Isaiah D. Barclay threatening legal action over the illegitimate October 4, 1965 termination of the 1946 Chamberlin & Barclay Stockholders Agreement.

112.   <u>November 9, 1966</u> - Isaiah D. Barclay executed a revocable inter vivos life insurance trust agreement amendment.

113.   <u>June 12, 1967</u> - Isaiah D. Barclay writes last letter to wife, Gladys S. Barclay regarding the "state" of financial affairs.

114.   <u>June 26, 1967</u> - Isaiah D. Barclay executed an alleged revocable inter vivos life insurance trust agreement amendment.

115.   **<u>January 10, 1968</u> - Isaiah D. Barclay died leaving a Will, Codicil and Trust Agreement**. The 1946 Chamberlin & Barclay, Inc., Stockholders Agreement remains in full legal effect, beneficial to Isaiah D. Barclay's heirs, legal representatives and successors, notwithstanding the illegitimate October 4, 1965 purported termination.

116.   <u>January 24, 1968</u> - Will, Codicil and Trust agreement probated January 24, 1968 and recorded in Will Book 222, page 162 in the Middlesex County Court in the State of New Jersey.

117.   <u>On June 19, 1968</u>, Co-executor/trustee, Gladys S. Barclay presented evidence to Girard Trust Bank Vice President, W. Kyrel Meschter proving her late husband and testator, Isaiah D. Barclay never signed any purported July 15, 1966 Chamberlin & Barclay, Inc., stockholders redemption agreement.

118.   <u>July 6, 1970</u> - By written will dated July 6, 1970, Gladys S. Barclay expressly appointed the principal of the Marital Trust under the Will of Isaiah D. Barclay to her estate upon her death and the Income Accumulation Trust directly to her two children, Elizabeth B. Poling and William S. Barclay. Edward L. Poling and  the First National Bank of Cranbury (PNC Bank) were the intended executors and co-trustees for the E. Barclay Poling Trust, the Daniel L. Poling Trust, the John C. Poling Trust and the J. Clark Poling Trust under the 1970 Will of Gladys S. Barclay.

119.    <u>November 22, 1972</u> - Judgment on Final Account of Isaiah D. Barclay in the Middlesex County Court, Probate Division.

120.    <u>January 9, 1974</u> - John Bishop first files the Account of Girard Trust Bank ( Mellon Bank) and Gladys S. Barclay for the Estate of Isaiah D. Barclay in the Orphan's Court in Philadelphia.

121.    <u>April 29, 1974</u> - Account of Girard Trust Bank ( Mellon Bank) and Gladys S. Barclay for the Estate of Isaiah D. Barclay is confirmed by Judge Silverstein in the Orphan's Court in Philadelphia.

122.    <u>March 14, 1975</u> - Schedule of Distribution of the Account of Girard Trust Bank ( Mellon Bank) and Gladys S. Barclay for the Estate of Isaiah D. Barclay is filed and approved in the Orphan's Court in Philadelphia.

123.    <u>January 19, 1976</u> - By alleged written will dated January 19, 1976, witnessed only by Albert C. Barclay and Marion T. Barclay, husband and wife, testator Gladys S. Barclay allegedly expressly appointed the principal of the Marital Trust and the Income Accumulation Trust under the Will of Isaiah D. Barclay and all of her property only to her executors upon her death. One of her purported executors and co-trustees was Albert C. Barclay, the attorney who wrote her alleged will. The First National Bank of Cranbury (PNC Bank) was the intended corporate co-trustee for the Elizabeth B. Poling Trust, the E. Barclay Poling Trust, the Daniel L. Poling Trust, the John C. Poling Trust and the J. Clark Poling Trust under the purported 1976 Will of Gladys S. Barclay.

124.    <u>January 12, 1978</u> - Huff & Moran file a will contest action in the Matter of the Estate of Gladys S. Barclay.

125.    <u>February 15, 1978</u> - Convery & Convery file a Counter-claim and Third Party Complaint in the Matter of the Estate of Gladys S. Barclay.

126.   February 28, 1978 - Accounts of Girard Trust Bank (Mellon Bank) Surviving Trustee of the Marital and Residuary Trusts for the Estate of Isaiah D. Barcaly are filed in the Orphan's Court in Philadelphia.

127.   June 2, 1978 - Consent Judgment signed by Judge Furman purporting to settle a will contest action in the Estate of Gladys S. Barclay.

128.   June 15, 1978 - Accounts of Girard Trust Bank (Mellon Bank) Surviving Trustee of the Marital and Residuary Trusts for the Estate of Isaiah D. Barcaly are confirmed by Judge Shoyer in the Orphan's Court in Philadelphia.

129.   November 29, 1978 - Schedules of Distribution of the Accounts of Girard Trust Bank (Mellon Bank) Surviving Trustee of the Marital and Residuary Trusts for the Estate of Isaiah D. Barcaly are approved by Judge Shoyer in the Orphan's Court in Philadelphia.

130.   December 19, 1980 - Final Accounting for the estate of Gladys S. Barclay submitted to the Surrogate's Court in Middlesex County, New Jersey for approval. No letters of trusteeship were issued to corporate co-trustee, the Cranbury First National Bank or successor Midlantic Bank (PNC Bank today).

131.   November 19, 1996 - Albert C. Barclay, Jr, Esq., vigorously fights J. Clark's Motion to Compel production of Isaiah and Gladys Barclay's estate and personal tax returns and further argued in open court, on behalf of his client's Mellon Bank and William S. Barclay; "that all tax returns and other estate records were destroyed after ten-years and did not exist."

### (A) SCHEME TO TERMINATE THE CHAMBERLIN & BARCLAY, INC., "1946 STOCKHOLDERS AGREEMENT"

134.   Both decedents, Isaiah D. Barclay and Gladys S. Barclay were indispensable parties to and did fully execute the December 16, 1946 Chamberlin & Barclay, Inc., Stock Redemption Agreement which was in full force and effect on January 10, 1968 when Isaiah D. Barclay died.

135.    Defendant, Estate of Albert C. Barclay (21% of outstanding shares) and Estate of E. Stanley Barclay (34% of outstanding shares) were indispensable parties to and did fully execute the December 16, 1946 Chamberlin & Barclay, Inc., Stock Redemption Agreement which was in full force and effect on January 10, 1968 when Isaiah D. Barclay died.

136.    Both Albert C. Barclay and E. Stanley Barclay were alive on January 10, 1968 when their brother died.

137.    The Stock Redemption Agreement provides that a stockholder who wishes to sell his stock while living must sell it to the corporation, which agrees to purchase the stock at 80% of book value.

138.    It provides further that on the death of a stockholder his stock shall be purchased by the corporation for 80% of its book value.

139.    It provides that on the death of a husband the shares of stock held by his wife shall be sold to the corporation as if she had died with her husband, so that no wife shall hold stock after her husband's death.

140.    Finally the Agreement provides in Paragraph 7; " THIS AGREEMENT SHALL BIND AND BENEFIT THE PARTIES HERETO, THEIR HEIRS, LEGAL REPRESENTATIVES, SUCCESSORS AND ASSIGNS."

141.    In April of 1965, after almost ten frustrating years of effort to agree on a fair and satisfactory new stockholders agreement with his two brothers and because of serious illness, worry about the business, it's future management and finances, Isaiah D. Barclay decided "it would be better for me to sell out at a loss while living than risk losing a greater amount in case of my death." He called a meeting of Chamberlin & Barclay, Inc., stockholders and pursuant to the December 16, 1946

"Stockholders Redemption Agreement", paragraph two, he gave written notice to the corporation of his intention to sell as of January 1, 1966.

142.   This announcement gravely affected the financial futures of Isaiah's two brothers, defendants, Albert C. Barclay and E.Stanley Barclay and their families. Chamberlin & Barclay, Inc., stock was the single largest asset of all three Barclay Brothers and their wives and was their main source of income. Isaiah & Gladys Barclay owned 54.20% of the collective outstanding shares of C&B stock. Stanley & Elinor owned 28.40% and Albert & Marion Barclay owned 17.40% of the outstanding shares. Isaiah was the President of C&B and was the only brother capable of running the company. If the two brothers were saddled with the debt of a $700,000 redemption of Isaiah & Gladys Barclay's shares combined with their lack of management ability, the future of their investments in C & B would look very bleak.

143.   It was a well known fact at the time, that Isaiah's brothers, Albert C. Barclay and E. Stanley Barclay could not work together and in fact despised each other. With no hope of a joint effort to legally overcome their brother, Isaiah's "put" under the stockholders agreement, Albert C. Barclay and his son Albert C. Barclay, Jr., who recently graduated Harvard Law School, devised an illegitimate scheme to subvert the 1946 stockholders agreement and his brother, Stanley Barclay's legal rights under said agreement. The bonus play was that Albert & Marion Barclay would be immediately cashed out of their substantial investment in C & B, albeit, illegally.

144.   Albert Barclay, who was Isaiah Barclay's next door neighbor came over to Isaiah's house on numerous occasions between April 1965 and October 1965 trying to coerce Isaiah to directly purchase Albert & Marion Barclay's 235 shares of Chamberlin & Barclay Stock, in direct contravention of the 1946 binding agreement and Stanley & Elinor Barclay's legal rights under said agreement, which required that all shares be sold back only to the corporation, reducing in effect the

number of outstanding shares and preserving Stanley & Elinor Barclay's 1/3 plus buffer safeguard against unilateral majority rule.

145.    On <u>September 30, 1965</u>, Isaiah Barclay and his two brothers, Stanley Barclay and Albert Barclay had a stockholders meeting at the Chamberlin & Barclay corporate office to again discuss Isaiah Barclay's pending "put" of his shares under the 1946 agreement and the purchase by the corporation of all the stock of Albert & Marion Barclay. With all shareholders present it was agreed that Isaiah Barclay as President of the Corporation would negotiate with Albert & Marion Barclay for the purchase by the corporation of all of their stock pursuant to the 1946 agreement.

146.    However, on October 4, 1965, Albert C. Barclay and Albert C. Barclay, Jr., convinced Isaiah Barclay that Stanley Barclay would not be a "problem" and that Isaiah should purchase Albert & Marion Barclay's 235 shares directly. At 8:00 P.M. on the night of October 4th a corporate meeting was held at Albert Barclay's law office in Hightstown, New Jersey without Stanley or Elinor Barclay in attendance. Notwithstanding the consequences, it was decided that Isaiah Barclay would individually purchase all of Albert & Marion Barclay's C&B stock for $200,000. A new contract was drawn up by Albert Barclay, Jr., Esq.. Upon signing the Agreement along with Albert & Marion Barclay, Isaiah Barclay gave Albert & Marion a check for $10,000. The entire illegitimate transaction was  witnessed and signed by Albert C. Barclay, Jr., attorney at law. Under the agreement $30,000 was due on January 4, 1966 and $40,000 was due on each of January 4th 1967, 1968, 1969 and 1970 bearing interest at the rate of 6% per annum payable semi-annually.

147.    At 9:30 P.M. , on October 4, 1965, a First National Bank of Cranbury Trustee Committee meeting was held at the bank in Cranbury, New Jersey. In attendance were the Cranbury Bank Vice President and Trust officer, Leslie W. Perrine, Director and Trust Committee chairman, Albert C. Barclay, bank attorney and Director, Jack Huff, bank President, Isaiah D. Barclay, Gladys

S. Barclay and Marion Barclay. Stanley & Elinor Barclay were not invited even though Stanley Barclay was a Director in the bank and an Officer of Chamberlin & Barclay, Inc.. Together, the parties to the new October 4, 1965 Stockholders Agreement purported to have executed a legal agreement and now allegedly being two-thirds of the stockholders of Chamberlin & Barclay, Inc., they requested the bank to immediately terminate the trust agreement dated December 16, 1946 and release and deliver to each stockholder all stock certificates registered in his or her name. By way of signature dated October 4, 1965  the First National Bank of Cranbury's Trust Officer and Vice President, Leslie W. Perrine, without further investigation terminated the 1946 Agreement in his fiduciary capacity of the Trustee of the 1946 Stockholders Agreement. All Chamberlin & Barclay, Inc., Stock was released from the bank's custody.

148.    Three weeks later, after Stanley and Elinor uncovered the scheme to terminate the 1946 Agreement and take control of Chamberlin & Barclay, Inc., they sent a Registered Letter, Return Receipt Requested dated October 29, 1965 to Isaiah D. Barclay individually and as President of Chamberlin & Barclay, Inc., with copies going to Gladys S. Barclay, Albert C. Barclay, Marion T. Barclay, The First National Bank of Cranbury in their fiduciary capacity, Chamberlin & Barclay, Inc., in their fiduciary capacity and several New York law firms.

149.    The net effect of the October 29, 1965 letter was a complete stalemate, with settlement negotiations going back and forth between Isaiah D. Barclay and E. Stanley Barclay via expensive New York attorneys through June of 1966. Proposals and counter proposals were made regarding a new Stockholders Agreement but no agreement was ever executed by Isaiah & Gladys Barclay. Girard Trust Bank was well aware of the fact that no agreement was reached because it was the largest asset of the Isaiah D. Barclay Trust and "Mr. W. P. Blackman, Vice President of Girard Trust of Philadelphia and their attorneys reviewed several of the proposed ideas."

150.    In the last letter Isaiah D. Barclay ever wrote to his wife, Gladys S. Barclay, dated June 12, 1967, six months before his death, starting on the middle of page three, Isaiah clearly writes; "C + B - Leaving this until last as hardly know what to say. As long as Father lived our business was wonderful. Since then it has been constant bickering. Shag + Stan alike until I bought Shag out. Then Stan + Elinor through Dexter sued us. We have some kind of a stockholders agreement. Girard or someone will have to help you work it out. Had hoped to live long enough to work it out. Perhaps a sale or merger can be arranged. Perhaps Ed + Bill can help you. Always thought business might be sold locally to some good customers. If I am spared a couple years will try to work this out. Wont writ more tonight. Love to you + all children + grandchildren."

151.    Isaiah D. Barclay died January 10, 1968 leaving a Will, Codicil and Trust agreement probated January 24, 1968 and recorded in Will Book 222, page 162 in the Middlesex County Court in the State of New Jersey. By proceedings had in the County Court of Middlesex County, State of New Jersey, said instruments were admitted to probate as the last will and testament of said decedent, that thereafter letters testamentary under the will were issued to  Girard Trust Bank, predecessors to defendant, Mellon Bank, N.A., successor corporate executor and co-trustee and Gladys S. Barclay, widow, now deceased. Defendant, Mellon Bank became and is now the acting/surviving executor and corporate co-trustee responsible for estate property left by I. D. Barclay.

152.    Isaiah D. Barclay executed a revocable inter vivos life insurance trust on May 27, 1963, and amendments thereto on November 9, 1966 and June 26, 1967. The trust instrument, as amended, provides that upon his death (which occurred January 10, 1968) the proceeds of the life insurance policies, as augmented by settlor's probate estate, be collected by his trustees and be fractionally divided into a marital trust, in such a manner as to realize the maximum federal estate tax benefits, FIRST: Marital Trust for Wife;

"...upon my death the trustees shall set aside in a separate trust for her a fractional share of the principal exactly sufficient to reduce the federal estate tax falling due because of my death to the lowest possible figure..."

FIRST, as amended;

"In computing the fractional share of the principal to be allocated to this trust, the final determinations for federal estate tax purposes in my estate shall control and the value of any property not passing under this article which qualifies for the marital deduction or any similar benefit available under the federal estate tax law in force when I die shall be taken into consideration."

153.    The trust instrument, as amended, provides in Article

SECOND Residuary Trust that;

"After my death the trustee shall hold all of the principal not becoming subject to article FIRST as a separate trust under this article SECOND..."

154.    The trust instrument, as amended, provides in Article

THIRD Income Accumulation Trust that;

"If my wife survives me, the trustee shall establish for each of   my wife and my children a separate trust under article THIRD, the principal of which shall consist of all income transferred to it..."

155.    The trust instrument, as amended, provides in Article

EIGHTH that ;

"All federal, state, and other death taxes payable because of my death...shall be paid out of principal becoming subject to article SECOND (Residuary Trust)..."

156.    Gladys S. Barclay was Isaiah D. Barclay's loving wife and partner and was appointed co-executor and co-trustee of the Will and Trusts established by her husband.

157.    Throughout Isaiah & Gladys Barclay's married life Isaiah trusted Gladys implicitly regarding all matters of finance and partnership property.

158.    Gladys S. Barclay's own personal wealth included over $400,000 of "Blue Chip" stocks in 1965 (I.D.B. had $1,000,000 in "Blue Chip" stocks in 1965). Her 38.23% direct ownership

(273 shares out of 714 "family" shares of Chamberlin & Barclay, Inc. stock) comprised the largest single and most important asset held between husband and wife.

159. After Isaiah D. Barclay's death on January 10, 1968 and per the Codicil of Isaiah D. Barclay's will, his 51.40% interest in Chamberlin & Barclay, Inc., stock, controlled by the "1946 Stock Redemption Agreement", current estimated value @ $8,706,960 fell into residue which became part of the Life Insurance Trust previously established by him. The Trustee of the 1946 Stock Redemption Agreement and stock certificate "custodian" was the First National Bank of Cranbury.

160. When the Trust was split into a Marital and Residuary Trust in 1974, Isaiah D. Barclay's 51.40% interest in Chamberlin & Barclay, Inc., stock, controlled by the "1946 Stock Redemption Agreement", was not repurchased by the corporation and not converted to cash pursuant to the notarized 1946 binding agreement.

161. Instead, in an elaborate embezzlement scheme directed by minority stockholders, directors and fiduciaries, namely father and son defendants, Albert C. Barclay, Esq., and Albert C. Barclay, Jr., I.D. Barclay's 51.40% interest in Chamberlin & Barclay, Inc., was ultimately transferred by the defendant co-trustee, Girard Trust Bank for the sole benefit of a pre-selected life beneficiary and defendant, William S. Barclay, without review of a guardian or trustee ad litem or notice to interested parties or the court.

162. Father and son defendants, and law partners, Albert C. Barclay, Esq., and Albert C. Barclay, Jr., Esq., were joined in their scheme by defendants Marion Barclay, E. Stanley Barclay, Elinor S. Barclay, William S. Barclay and their embezzlement scheme was facilitated by defendants, First National Bank of Cranbury Vice President, Leslie W. Perrine, Girard Trust Bank Vice President, W. Kyrel Meschter, and the Law firm of Huff & Moran partner, Jack Huff.

163.    The embezzlement scheme has been covered-up and perpetuated for over thirty-years by the aforesaid defendants, assisted by defendants with constructive or direct knowledge, namely Elizabeth M. Barclay, Mellon Bank corporate counsel, Jeb Bell, Huff and Moran partner, Bill Moran, Susan B. Walcott, Edward S. Barclay, Ellen B. DeBlois, I. David Barclay, James Walcott and others.

164.    The illegitimate purpose, inter alia, of the scheme was to deceive, control, transfer and convert trust assets by way of a forged "photocopy" of an allegedly fully executed July 15, 1966 Stock Redemption agreement presented to Girard Trust Bank as authentic via interstate mail. All the aforesaid respective defendants benefited from the scheme in some way or form, to the total direct detriment of plaintiffs. By waiting until Isaiah D. Barclay died on January 10, 1968 before forging his signature on an agreement dated July 15, 1966 that I.D. Barclay would not agree to during his lifetime, the defendants overcame the biggest hurdle of all their pathetic lives and received almost $600,000 in 1968 dollars for their efforts, obviously they thought dead men could not speak from the grave or they did not care.

165.    However, on June 19, 1968, Co-executor/trustee, Gladys S. Barclay gave due notice and  presented evidence to Girard Trust Bank Vice President, W. Kyrel Meschter proving that she and her late husband and testator, Isaiah D. Barclay never signed any purported July 15, 1966 Chamberlin & Barclay, Inc., stockholders redemption agreement.

166.    Without further investigation, without questioning the self-interests of the parties involved, without notice to plaintiffs or the courts and without attaining the original alleged "July 15, 1966 Agreement", fiduciary, Girard Trust Bank and all the defendants involved with the scheme somehow coerced Gladys S. Barclay and acted as if  the purported agreement was a valid legal agreement and represented it as such to guardians and the respective courts via fraudulent accountings when they knew it was not. In furtherance of their scheme and with full knowledge of

the illegitimate nature of the 1946 Stockholders Agreement termination and the fabricated July 15, 1966 agreement, defendants continued their pattern of racketeering by fabricating further fraudulent Stockholders Agreements which were allegedly executed in 1975 to take rightful control of Chamberlin & Barclay, Inc., away from the Poling family.

167.   The criminal pattern of falsification of stock agreements, signature pages, stock registration certificates, government records of the courts, tax returns, recorded public deeds, wills, trust agreements, partnership agreements, contracts, easement agreements, letter agreements and leases has continued unabated for thirty-years and plaintiffs are in fear that any remaining trust property will be looted by the aforementioned defendants. (SEE EXHIBIT "4" & "5" - Affidavits of J. Clark Poling dated October 27, 1997 and July 27, 1998 respectively, attached hereto and incorporated into COUNT I by reference)

### (B) FARM PARTNERSHIP CONTROL AND EMBEZZLEMENT SCHEME

168.   In fact it has been discovered through deed records that on June 30, 1981, defendant, Albert C. Barclay, Jr., Esq., having full knowledge of the fact that Farms known as the "Gauntt Farm", "Tantum Farm" and "Major Farm" were the assets of Barclay Farms Partnership and that original partner, Isaiah D. Barclay had a 1/6 interest in the partnership as a co-owner with the original partners of the aforesaid specific partnership property holding as a tenant in partnership, did willfully prepare and execute three illegitimate "executor sale deeds" in his alleged capacity of Executor, Attorney and Sole-Trustee under the will of Gladys S. Barclay and Barclay Farms Managing Partner. Said deeds directly conflict with and contravene the United States Estate Tax Return - Form 706 for the Gladys S. Barclay Estate he prepared and filed for the estate listing decedent, Gladys S. Barclay's interest in the "Gauntt Farm", "Tantum Farm" and "Major Farm" on Schedule F as personalty rather than realty.

169.    Plaintiffs allege Defendant's have continued a pervasive pattern of vindictive and acrimonious conspiratorial  ouster of plaintiffs from their partnership properties (with Albert C. Barclay, Jr., as the "ring leader") via "super-gluing" locks, threats of bodily harm, control and attorney fee schemes, tax schemes, conversion of partnership real property, conversion of rents, conversion of barn antiques including stain glass windows, barn timbers and paneling schemes and that these inequitable and illegal acts  demand an immediate accounting and imposition of a constructive trust.

170.    Plaintiffs, fear for their life and property due to these pervasive vindictive acts of their co-partners and fiduciaries, and fear future irreparable harm if injunctive relief is not ordered forthwith.

### (C) **SCHEME TO BENEFIT FIDUCIARIES AND SELECTED BENEFICIARIES**

171.    On April 29, 1974, the Honorable Judge Silverstein, by way of  confirmation of the Account of Girard Trust Bank ( Mellon Bank) for the Estate of Isaiah D. Barclay in the Orphan's Court in Philadelphia, decided not to appoint a guardian for the minor Poling plaintiffs but instead Ordered; "Should, however, the trustees exercise their discretion in dividing the trust into the marital and residuary in such a way that each asset is not fractionalized, then a guardian and trustee ad litem will be appointed to review this said allocation as reflected in the schedule of distribution."

172.    Per the Codicil of Isaiah D. Barclay's will, his rare coin collection, current estimated value @$196,000, fell into residue which became part of the Life Insurance Trust previously established by him.

173.    When the Trust was split into a Marital and Residuary Trust the rare coin collection was not fractionalized. Instead, in direct contempt of Judge Silverstein's Court Order, the rare coins were extracted from the estate by the defendant co-trustee, Girard Trust Bank for the benefit of

another co-trustee without review of a guardian or trustee ad litem or notice to interested parties or the court. Said co-trustee receiving benefit of the contemptuous transfer gave the bulk of the collection away as gifts to life-long friends. Plaintiffs have been directly damaged by said fiduciary scheme pursuant to their aforementioned direct and beneficial interests in the respective I.D. Barclay Marital and Residuary Trusts.

174.   Girard Trust Bank benefited by acquiring the Estate of William S. Barclay, albeit, with one contingency, they had to fire plaintiff, Edward L. Poling as Vice President of Chamberlin & Barclay before William S. Barclay would place his estate in Girard Trust Bank. In November of 1972, Plaintiff, Edward L. Poling was fired with no notice or reason. From that point on defendant, Girard Trust Bank had a bias via estate planning methods to enhance the present and future value of the William S. Barclay estate to the total detriment of the plaintiffs. At the time, Girard Trust Bank was heavily marketing their trust services in Central Jersey and were looking for clients with "means".

175.   Defendant, Girard Trust Bank (Mellon) also benefited by a scheme to illegitimately decrease the value and amount of trust assets to be placed in the Marital Trust which they knew was already appointed by a 1970 will to the estate of Gladys S. Barclay. In essence, they knew they would lose control of the Marital trust so every effort was made to enhance the present and future value of the Residuary Trust for which they were the corporate trustees for life.

### (D) SCHEME TO SECURE A DIRECTORSHIP IN CRANBURY FIRST NATIONAL BANK FOR DEFENDANT WILLIAM S. BARCLAY

176.   Per the Codicil of Isaiah D. Barclay's will, his 22,464 rights or "stock options" issued by the First National Bank of Cranbury, current estimated value @ $573,680, fell into residue which became part of the Life Insurance Trust previously established by him.

177.   When the Trust was split into a Marital and Residuary Trust I. D. Barclay's 22,464

rights or "stock options" were not fractionalized. Instead, in direct contempt of the Court, the 22,464 rights or "stock options" were extracted from the estate by the defendant co-trustee, Girard Trust Bank for the sole benefit of a selected life beneficiary and defendant, William S. Barclay, without review of a guardian or trustee ad litem or notice to interested parties or the court. Said selected life beneficiary and defendant, William S. Barclay who received the benefit of the contemptuous transfer, exercised the stock options in an orchestrated attempt to amass enough Cranbury Bank Shares to gain a Directorship and influence or control over the same bank which was the Trustee of all Chamberlin & Barclay, Inc., shares of stock, the very same close corporation he was scheming to attain control of as it's President. The First National Bank of Cranbury was also the appointed Executor and Trustee of the Gladys S. Barclay 1970 will and trust agreement. The Gladys S. Barclay estate controlled or would control 34.79% of all outstanding Chamberlin & Barclay, Inc., stock, enough to prevent a two-thirds majority. Influence or control of the Cranbury First National Bank was also key as the bank provided hundreds of thousands of dollars in loans to Chamberlin & Barclay, Inc., for continuing operations. Plaintiffs have been directly damaged by said fiduciary scheme pursuant to their aforementioned direct and beneficial interests in the respective I.D. Barclay Marital and Residuary Trusts, defendant Girard Trust Bank ( Mellon) breached their fiduciary duty to plaintiffs and defendant, William S. Barclay was unjustly enriched.

178.    Per the Codicil of Isaiah D. Barclay's will, his 22,464 shares of First National Bank of Cranbury Stock, 1974 estimated value @ $700,000 fell into residue which became part of the Life Insurance Trust previously established by him.

179.    When the Trust was split into a Marital and Residuary Trust, 645 shares out of I. D. Barclay's 22,464 shares of First National Bank of Cranbury Stock, current estimated value @ $197,662 were not fractionalized. Instead, in direct contempt of the Court, in early 1973, 645 shares

of FNBC were extracted from the estate by the defendant co-trustee, Girard Trust Bank for the sole benefit of a selected life beneficiary and defendant, William S. Barclay, without review of a guardian or trustee ad litem or notice to interested parties or the court. Said selected life beneficiary and defendant, William S. Barclay received the benefit of the contemptuous transfer by finally amassing enough Cranbury Bank Shares to gain a Directorship in early 1973. .Plaintiffs have been directly damaged by said fiduciary scheme pursuant to their aforementioned direct and beneficial interests in the respective I.D. Barclay Marital and Residuary Trusts.

180.    Per the Codicil of Isaiah D. Barclay's will his 1/3 interest in Millstream Farms, current estimated value @ $6,500,000 fell into residue which became part of the Life Insurance Trust previously established by him.

## (E) WILL CONTEST SCHEME

181.    On July 6, 1970, at 68 years of age, Gladys S. Barclay was in good mental and physical health. She was elected as the first woman to ever serve as a Director of the First National Bank of Cranbury in 1969 and effectively served until her mental and physical health deteriorated to the point where she voluntarily resigned in 1972.

182.    Her July 6, 1970 Will was executed in the presence of three witnesses to wit: Albert C. Barclay, Barbara Dedrick and Eleanor Weck.

183.    Under the terms of the 1970 Will, Edward L. Poling, and defendants, the First National Bank of Cranbury, and William S. Barclay were named as Executors and Trustees.

184.    Under the terms of the 1970 Will, the said defendant, Albert C. Barclay, was not an Executor and Trustee, nor was defendant, Albert C. Barclay, Jr., a contingent Executor and Sole Trustee or estate attorney.

185.   After 1972, Gladys S. Barclay's physical as well as mental health was compromised by several open heart surgeries and chronic severe hepatitis she contracted from numerous blood transfusions in the hospital. Due to heavy prolonged medication, depression and her weakened condition, Gladys S. Barclay's mental and physical health deteriorated rapidly until her prolonged hospitalization and death on July 29, 1977.

186.   Unknown to plaintiffs herein, a Will of Gladys S. Barclay was drawn by defendant, Albert C. Barclay and his son on January 19, 1976.

187.   Said will was prepared by Albert C. Barclay, brother-in-law and next-door neighbor of Decedent and his son and was allegedly executed at the home of Decedent in the presence of defendant, Albert C. Barclay and his wife, Marion T. Barclay as witnesses thereto.

188.   Plaintiffs herein have recently examined court records of said alleged signature of Gladys S. Barclay and hereby allege it is a forgery. A little over a year before her untimely death, allegedly  the time the new Will was executed, Gladys S. Barclay was an extremely sick woman weakened in mind and heart by the progressive toll of heart disease, liver disease,  hepatitis and daily heavy medication.

189.   The said Will in question was admitted to probate in the Middlesex County Surrogate's Court on August 9, 1977, and at which time letters testamentary were issued to purported Executors, defendants, Albert C. Barclay, William S. Barclay and  Elizabeth B. Poling.

190.   Said January 19, 1976 Will was contested by a Complaint filed on January 12, 1978 in the Superior Court of New Jersey, Middlesex County Docket No. P198-77 by the Law Firm of Huff and Moran purporting to dually represent both the interests of Elizabeth B. Poling and the wholly adverse interests of her brother, defendant, William S. Barclay. Plaintiffs have recently discovered through an exhaustive  examination of the court file that a Consent Judgment, dated

June 2, 1978 was entered into the record of the aforesaid case and purportedly was signed by Elizabeth B. Poling.

191. Said agreement, though purporting to compromise and settle disagreements as to the competency of the testatrix and the validity of the will and of its provisions and other matters, and purporting also to be the agreement of all the interested parties, and purporting to have been executed by all heirs at law and legatees and devisees of the estates of Isaiah D. Barclay and Gladys S. Barclay, and represented and submitted to the court as such, was not executed by J. Clark Poling, a minor at the time, John C. Poling, Daniel L. Poling, E. Barclay Poling, Edward L. Poling or their representatives. Corporate Executor and Co-Trustee, the First National Bank of Cranbury or their successor in interest also failed to execute the alleged "consent" agreement. Said agreement was submitted to the court without knowledge or notice to any of the aforesaid parties and the aforesaid parties had no knowledge or notice of the agreement filed with the court and purporting to modify the terms of the said will. Plaintiffs have but recently learned of the execution and filing of said agreement, of the order of the court thereon, and of the allowance of the will subject to the modifications contained in said agreement. In fact, the knowledge of the incompleteness of signatures to the instrument was knowingly withheld from the court. The aforesaid omitted parties interests became vested upon the death of decedents, and the erroneous consent judgment rendered in the Surrogate's Court without notice to or consent of the aforesaid parties in violation of the due process clause, in a proceeding to which they were not parties results in an absence of jurisdiction to render such judgment and can not now affect their respective rights.

192. Facts, which will not be disclosed in public record, but through sealed court documents will bear out the truth that Elizabeth B. Poling, ("Poor Betty" as her mother

called her) would clearly not have been a named Executor of her mother's estate. Elizabeth B. Poling stated to plaintiffs that if she ever signed legal documents she was unaware of what she was signing when she was purportedly executing various consent judgments, decrees settling accounts and deeds at the pressured insistence of the other defendants, who were majority executors or trustees. She did not understand what she was signing and was not told what she was signing if she indeed did sign various documents in her capacity as a purported executor.

193.    Further facts will establish that  Elizabeth B. Poling was the unwitting victim of the dominating influence of her brother and the undue influence combined with the severe conflicts of interest and coercion  of defendants, Albert C. Barclay and his son, Albert C. Barclay, Jr., and the Law Firm of Huff and Moran who were also attorneys for, and were on the Board of Directors (together with William S. Barclay and Albert C. Barclay as Vice President) of the First National Bank of Cranbury, the corporate executor and trustee expressly named in Gladys S. Barclay's July 6, 1970 Will and also expressly named as the trustee of all shares of Chamberlin & Barclay, Inc., stock under the 1946 Stock Redemption Agreement.

194.    Defendant, PNC Bank Corp., (successor to the First National Bank of Cranbury) legally qualified as both an Executor and Trustee of the Estate of Gladys S. Barclay but no record exists in Docket No. P198-77 of notice to or service of process upon the First National Bank of Cranbury. The First National Bank of Cranbury was a necessary and indispensable party to this Will contest action yet their name does not affirmatively appear anywhere in the record of this action.

195.    Edward L. Poling legally qualified as both an Executor and Trustee of the Estate of Gladys S. Barclay but no record exists in Docket No. P198-77 of notice to or service of process upon Edward L. Poling. Edward L. Poling was a necessary and indispensable party to this Will contest

action yet his name does not affirmatively appear anywhere in the record of this case and he hereby alleges that the aforesaid consent judgment is unenforceable in this court.

196.    Elizabeth B. Poling stated to plaintiffs that she did not know the facts as they actually existed upon her father and mother's deaths and she believed that the defendant, trustees were executing the express trusts in accordance with their terms and in which she was entitled to all trust income for life. Through an extensive private investigation which was just completed with no help from fiduciaries it has been conclusively determined by deeds that certain real estate and other assets originally belonging to said trust estates had and has been hidden, diverted and has been sold, from time to time, by the then and presently acting defendant fiduciaries.

197.    No part of the proceeds derived from the sale of the several pieces of the diverted real estate which have been sold as aforesaid, have ever been distributed to any of the Poling family beneficiaries under said trusts, nor has all of the income received from said trust estates been distributed to the Poling family life beneficiaries.

198.    Plaintiff, Elizabeth B. Poling further stated to plaintiffs she had no knowledge that a 1946 Chamberlin & Barclay, Inc., Stock Redemption Agreement existed and that the probate value of the estates largest asset, Chamberlin & Barclay, Inc., was "undetermined" in court documents almost five years after her father died. She also never knew that the Marital Trust was not even funded until seven years after her father's death. These material facts benefited fiduciaries but were never disclosed to plaintiffs or Elizabeth B. Poling by any party and constitute an express trust breach adversely affecting plaintiffs and beneficiaries right to all trust income for life.

### ENTERPRISE

199.    The racketeering enterprise, within the meaning of 18 U.S.C. SECTION 1961, is Barclay Brothers and Barclay Farms Partnerships, New Jersey general partnerships, and Albert C.

Barclay, Jr. purports to be the managing partner and all defendants in this action are associated with or do business with the "enterprises".

200.    The enterprises are entities separate and apart from the pattern of activity in which it engages.

201.    The common purpose of the enterprise is to exercise illegitimate control of security interests held by fiduciaries for the benefit of plaintiffs and to continue extracting money or property from plaintiffs or their trust accounts under false and fraudulent pretenses using both the interstate mails and wire to do so.

202.    The enterprise is engaged in interstate commerce

## COUNT II:
### FOR ORDER UNDER 9 U.S.C. § 4 DIRECTING ARBITRATION TO PROCEED ACCORDING TO TERMS OF CONTRACTS - EXISTENCE OF ARBITRATION AGREEMENTS UNDISPUTED

203.    Plaintiffs hereby incorporate by reference J. Clark Poling's July 27, 1998 Affidavit attached as EXHIBIT "4" and repeat and reallege the allegations contained in paragraphs 1 through -- 202, inclusive.

204.    Plaintiffs suffered damages as a result of defendants wrongful actions.

### INTRODUCTION

205.    The basic issue presented in this count, as in the Supreme Court's decision in Moses H. Cone, 460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983), is "the arbitrability of the dispute" between the opposing parties, and federal law governs that issue whether it is raised in federal or state court. Id. at 24, 103 S. Ct. at 941. More specifically, plaintiffs allege that, as in the Supreme Court's decision in Southland Corp. v. Keating, 465 U.S. 1, 7, 104 S. Ct. 852, 856, 79 L. Ed. 2d 1 (1984), defendants resistance to arbitration and their litigating in two court systems, in a manner hardly in accord with the Supreme Court's approach that, "contracts to arbitrate are not to be avoided by

allowing one party to ignore the contract and resort to the courts" lead to prolonged litigation and undue damages, one of the very risks the parties, by contracting for arbitration, sought to eliminate.

## FACTUAL ALLEGATIONS

206.    COUNT TWO is brought by all plaintiffs against all defendants who were direct contract parties as well as third party contract beneficiaries or successors to the respective December 29, 1988 "Barclay Brothers" - Hovnanian Option Agreement containing an arbitration clause, and the respective August 28, 1984 "Barclay Brothers" - Toll Brothers Easement Agreement containing an arbitration clause, including all legal amendments/modifications thereto.

207.    On or about  August 28, 1984 and December 29, 1988 plaintiffs (directly and as third party contract beneficiaries) and the aforesaid defendants entered into written contracts for the option and purchase of approximately ninety-five acres of prime farmland located in East Windsor Township, New Jersey, known as the "Chamberlin Farm" for the construction of respective access easement roads and 303 single family homes. Copies of the contracts are attached to this complaint, marked Exhibits "_____" and "_____", and incorporated by reference.

208.    Each of the contracts contained a provision by which parties agreed to settle by arbitration any controversy that arose out of the contracts.

209.    The following controversies inter alia have arisen from the contracts: whether defendants colluded to hide evidence of environmental tampering via non-disclosed and fraudulent environmental reports and a $10,000 bribe in the midst of litigation; whether Hovnanian filed a proof of claim with the Travelers Insurance Company regarding alleged environmental contamination before purporting to default plaintiffs under the contracts environmental claims provisions; whether defendants colluded by allowing without objection the willful and reckless attachment of liens and environmental stigma to the property as part of a securities fraud and price fixing scheme; whether

defendants colluded to hide evidence of Hovnanian's failure to comply with East Windsor Township Development Resolutions and contractual matters in a good faith timely manner; whether defendants colluded to hide evidence of the illegal removal and conversion of thousands of tons of prime topsoil from the property; whether defendants colluded to remove development plans from East Windsor Township Offices and to obstruct the contractual return of development plans to plaintiffs in direct violation of the state open records laws and the contract; whether Toll Brothers easement option agreements were forged; whether Toll Brothers/Hovnanian materially defaulted on their respective agreements; whether Hovnanian offered consideration for purported material new terms and modification of option six; whether all parties including successors under the contracts legally executed the purported Toll Brothers extension agreements and Hovnanian's June 22, 1995 option six extension agreement or the purported October 2, 1995 letter extension agreement; whether said contracts were legally terminated by recordation of memorandum agreements pursuant to the contract; whether plaintiffs ever received option payments from defendants; whether defendants colluded to defraud plaintiffs out of their property via pending state court partition and tortious interference partnership control lawsuit schemes when all parties were bound by the exclusive contractual remedy of arbitration. (See EXHIBIT "4")

210.    Notwithstanding the clear language of the respective contracts, plaintiffs were sued by contract party defendants in several simultaneous Superior Court of the State of New Jersey actions in an attempt by defendants to evade the agreed-upon resolution of their disputes in the arbitration forum by introducing   identical contract controversies in separate law and equity judicial forums against plaintiffs, who purportedly (according to defendants) were not contract parties although they were alleged to be ultimately liable for the original contract party's acts.

211.    Plaintiffs are "aggrieved" by the defendants' failure to arbitrate and may on that basis alone compel or participate in arbitration under 9 U.S.C. § 4. Section 4 provides that a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court" for an order compelling arbitration. Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement."

**COUNT III:**
**CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS UNDER**
**THE CONSTITUTION OF THE UNITED STATES**
**(VIOLATION OF 42 U.S.C. §§1983-1988)**
**FOR CONSPIRACY TO DEPRIVE PLAINTIFFS OF THEIR CONSTITUTIONAL DUE**
**PROCESS RIGHTS AND PRIVILEGES AS CITIZENS OF THE UNITED STATES**

212.    Plaintiffs hereby incorporate by reference J. Clark Poling's October 27, 1997 & July 27, 1998 Affidavits attached as EXHIBIT's  "4" & "5" respectively and repeat and reallege the allegations contained in paragraphs 1 through 211, inclusive.

213.    Count III is brought by all plaintiffs against all defendants.

214.    Jurisdiction is conferred on this court by 28 U.S.C. 1331.

215.    By virtue of being a partner of Barclay Farms and Barclay Brothers partnerships, the plaintiffs have a property interest and liberty interests secured by the Constitution and laws of the United States.

216.    The defendants have systematically deprived plaintiffs of partnership property interests and/or liberty interests under color of statute, ordinance, regulation, or usage.

**COUNT IV:**
**CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS**
**(BREACH OF FIDUCIARY DUTY)**

217.   Plaintiffs hereby incorporate by reference J. Clark Poling's October 27, 1997 & July 27, 1998 Affidavits attached as EXHIBIT's "4" & "5" respectively and repeat and reallege the allegations contained in paragraphs 1 through 216, inclusive.

218.   Plaintiffs suffered damages as a result of defendants wrongful actions.

## COUNT V:
## CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS
## (COMMON LAW FRAUD AND DECEIT)

219.   Plaintiffs hereby incorporate by reference J. Clark Poling's October 27, 1997 & July 27, 1998 Affidavits attached as EXHIBIT's  "4" & "5" respectively and repeat and reallege the allegations contained in paragraphs 1 through 218, inclusive.

220.   Plaintiffs suffered damages as a result of defendants wrongful actions.

## COUNT VI:
## CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS
## (CONSTRUCTIVE FRAUD)

221.   Plaintiffs hereby incorporate by reference J. Clark Poling's October 27, 1997 & July 27, 1998 Affidavits attached as EXHIBIT's "4" & "5" respectively and repeat and reallege the allegations contained in paragraphs 1 through 220, inclusive.

222.   Plaintiffs suffered damages as a result of defendants wrongful actions.

## COUNT VII:
## CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS
## (UNJUST ENRICHMENT)

223.   Plaintiffs hereby incorporate by reference J. Clark Poling's October 27, 1997 & July 27, 1998 Affidavits attached as EXHIBIT's "4" & "5" respectively and repeat and reallege the allegations contained in paragraphs 1 through 222, inclusive.

224.   Plaintiffs suffered damages as a result of defendants wrongful actions.

## COUNT VIII
## CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS
## (DEFAMATION)

225.    Plaintiffs hereby incorporate by reference J. Clark Poling's October 27, 1997 & July 27, 1998 Affidavits attached as EXHIBIT's "4" & "5" respectively and repeat and reallege the allegations contained in paragraphs 1 through 224, inclusive.

226.    Plaintiffs suffered damages as a result of defendants wrongful actions.

## COUNT IX
### CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS
### (NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

227.    Plaintiffs hereby incorporate by reference J. Clark Poling's October 27, 1997 & July 27, 1998 Affidavits attached as EXHIBIT's "4" & "5" respectively and repeat and reallege the allegations contained in paragraphs 1 through 226, inclusive.

228.    Plaintiffs suffered damages as a result of defendants wrongful actions.

## COUNT X:
### CAUSE OF ACTION BY PLAINTIFFS AGAINST DEFENDANTS
### (CONSTRUCTIVE TRUST)

229.    Plaintiffs hereby incorporate by reference J. Clark Poling's October 27, 1997 & July 27, 1998 Affidavits attached as EXHIBIT's "4" & "5" respectively and repeat and reallege the allegations contained in paragraphs 1 through 227, inclusive.

230.    Plaintiffs suffered damages as a result of defendants wrongful actions.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray that this Court enter judgment for plaintiffs and against defendants:

## ON ALL COUNTS

1.    For compensatory damages, for sum duly trebled, plus interest;

2.    For punitive damages;

3.      For temporary relief, preliminary and permanent injunction enjoining defendants, their

agents, servants, employees and all such persons acting in concert or participation with defendants

from continuing their wrongful acts as hereinbefore alleged;

4.      For reasonable paralegal and/or attorney's fees;

5.      For costs of the suit herein:

6.      For such other further relief as the Court may deem proper.

### ON COUNT II

7.      For Order under 9 U.S.C. § 4 directing Arbitration to proceed according to terms of

contracts; or in the alternative,

8.      For compensatory damages, for sum duly trebled, for violations of the RICO statutes,

plus interest due to waiver.

### ON COUNT IV

9.      Declaring that the "Major Farm" and "Tantum Farm" are assets of Barclay Farms

Partnership, a New Jersey general partnership;

10.     Declaring that the "Chamberlin Farm" is an asset of Barclay Brothers Partnership, a

New Jersey general partnership;

11.     Declaring that "Barcland Limited Partnership" is actually a New Jersey general

partnership;

12.     Declaring that J. Clark Poling and John C. Poling are the successor co-trustees of the

Elizabeth B. Poling trust under the will of Gladys S. Barclay pursuant to the trustee - beneficiary

successor agreement and that defendant Albert C. Barclay, Jr., be disqualified as opposing counsel in

litigation for any party, and that he be enjoined/disqualified as Trustee for the Trust of Elizabeth B.

Poling under the Will of Gladys S. Barclay for violations of federal and state statutes and pervasive detrimental conflicts of interest;

13.    Declaring that Isaiah D. Barclay, deceased was a 1/6 partner of Barclay Farms Partnership on the date of his death;

14.    Declaring that Gladys S. Barclay, deceased was a 1/6 partner of Barclay Brothers Partnership on the date of Isaiah D. Barclay's death.

15.    Declaring that the Chamberlin & Barclay, Inc., 1946 Stockholder's Agreement was not legally terminated pursuant to the terms of the agreement.

## ON COUNT X

16.    Requiring defendants to account to plaintiffs for all personal property and/or other assets derived from the embezzlement/conversion by fraud of plaintiff's trust assets or income;

17.    Enjoining defendants from transferring, disposing, or secreting common funds or partnership interests held with plaintiffs and/or other assets derived from the embezzlement/conversion by fraud of plaintiff's trust assets or income;

18.    For imposition of a constructive trust on the assets of Barclay Farms and Barclay Brothers partnerships, of Millstream Farms, Inc., and Chamberlin & Barclay, Inc., and that plaintiffs be granted legal title and exclusive possessory interest in these property interests.

## JURY DEMAND

Plaintiffs demand a trial by jury with respect to all issues so triable.

Dated: _September 22_, 1998.

J. Clark Poling - Pro Se
11025 138th Avenue
Fellsmere, Florida 32948
(561)571-8078

John C. Poling - Pro Se
20882 Soneto Drive
Boca Raton, Florida 33433
(561)477-5988

# EXHIBIT "1" - "Barclay Investigation" Family Tree



**EXHIBIT "2" - Isaiah D. Barclay & Gladys S. Barclay Trust Delineation**



## EXHIBIT "3"
## Delineation of the Poling Son's Legal Notice of Court Proceedings affecting their Rights, Title and Interest in Trust Property of the Estates of Isaiah & Gladys Barclay



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

J. CLARK POLING, et als.,   :  CASE NO.:_____

    Plaintiff(s),  :  CIV -

   v.      :

K. HOVNANIAN ENTERPRISES, :
INC., et als.,        **AFFIDAVIT OF**
         :  **J. CLARK POLING**

    Defendant(s).
_____:

STATE OF FLORIDA
COUNTY OF INDIAN RIVER

   BEFORE ME, the undersigned authority, personally appeared J. Clark Poling, who after being first duly sworn deposes and says:

 1. I am a plaintiff in the above entitled action. I have prepared and executed this Affidavit from my own direct knowledge as a result of the following investigation I conducted.

### *"BUYER LOOKING FOR A PROBLEM SCHEME"*

 2. In April of 1995, I became aware of my parents discontent in regard to an Extension of an Option Agreement that was dated June 29, 1992,(the Option Agreement expired on June 29, 1995). Five (5) related Barclay families, my parents and various

**EXHIBIT "4"**

Trusts, known as (the Sellers) signed a contract in 1984 between a company known as K. Hovnanian Companies/Enterprises, Inc., a New Jersey based Construction Company, (the Buyer). The amount of property under option for 11 years was 95 acres of farmland in Mercer County, New Jersey in the town of East Windsor. A Real Estate Company known as Cohen Schatz Associates, Inc. from Freehold, New Jersey was representing the Sellers, the Broker, Len Cohen was in charge of sale between Seller and Buyer. Option # 6 was the last Option given by Sellers that expired June 29, 1995.

3. On April 17, 1995, I sent a letter to Bruce Grosse, President of K. Hovnanian Companies of Central Jersey. I requested a status report of all required permits and approvals pursuant to the terms of the Option Agreement. I wanted proof that K. Hovnanian Companies had the required approvals and permits 60 days before June 29, 1995 to insure a closing on or before June 29, 1995. I was concerned that K. Hovnanian failed to pursue the approvals and permits pursuant to the terms of the Option Agreement.

4. On April 25, 1995, Bruce Grosse, President of K. Hovnanian Companies of Central Jersey mailed a letter to me and responded to my above April 17, 1995 letter.

5. On April 27, 1995, I sent another letter to Bruce Grosse, President of K. Hovnanian Companies since I had not yet received the above April 25, 1995 response. The basis of my second letter was to inform K. Hovnanian Companies that no 60 day notice had been received giving the Sellers notice of Buyers intention to close on Option #6 within 60 days of the expiration of Option #6, which was June 29, 1995. I also informed Mr. Grosse that I was not an Attorney and that I was representing myself and my families best interest in this transaction since the Agreement was binding to heirs and beneficiaries.

6. On or about April 29, 1995 I received the above letter dated April 25, 1995 from Bruce Grosse, President of K. Hovnanian Companies. Mr. Grosse gave me a status report of ten (10) approvals and permits. Mr. Grosse stated in his letter that, six (6) out of ten (10) approvals had been received. The four (4) remaining approvals in Mr. Grosse's letter that had not been received had nothing to do with the Option Agreement and the information was false. The Sellers contractual obligations had been completed by April 25, 1995, however, I relied on Mr. Grosse's letter dated April 25, 1995 as being true. No information about an environmental problem on the subject matter property had been stated in Mr. Grosse's, April 25, 1995 letter. It should be noted that an environmental stigma was created by K. Hovnanian Companies and *Najarian Associates on the subject matter property after Option #6 expired on June 29, 1995. (*Najarian Associates was formerly a subsidiary of K. Hovnanian Companies, today Najarian Associates is still owned by members of the Hovnanian family).

7. I was told by my father, Edward L. Poling in early May 1995, that Len Cohen, Realtor stated that K. Hovnanaian requested a price reduction of over a million dollars or K. Hovnanian would not purchase the subject matter property under the present terms of Option # 6. I was perplexed because Bruce Grosse did not write anything about price reductions in his above April 25, 1995 letter.

8. On May 3, 1995, I sent a letter to Albert C. Barclay, Jr., Edward S. Barclay, Jr., William S. Barclay and Susan B. Walcott attaching Bruce Grosse's above letter dated April 25, 1995. I stated to them that, "We do have a valid Option Contract in effect, I suggest to everyone that we do not change the Agreement. Hovnanian will change this

-3-

Agreement, Option # 6 again and again if we let them as they have done for 11 years".

9.  In October of 1996, I discovered that Mitch Newman, in house counsel for K. Hovnanian had discussed a Phase One Environmental Audit between Albert C. Barclay, Jr., and Mr. Hamilton from the Law Firm of Stark and Stark in Princeton, New Jersey on May 11, 1995. I obtained the aforesaid information in a May 1995 Stark and Stark Billing Statement from James Walcott, the son of Susan B. Walcott in the fall of 1996.

10.  James Walcott told me that both his mother, Susan Walcott and his uncle Edward S. Barclay, Jr. sued their Co-Trustee, United Jersey Bank and then lost the case in March of 1995. United Jersey Bank no longer wanted the Trusts for his mother or uncle so both Susan B. Walcott and Edward S. Barclay, Jr. had to search for a new permanent Co-Trustee for their Trusts. James Walcott further stated that Albert C. Barclay, Jr. was involved in the United Jersey Bank lawsuit and that Albert C. Barclay, Jr. created false Attorney billing statements against the E. Stanely Barclay Trusts to prove the amount of Attorney fees Albert C. Barclay, Jr. generated as a result of the sale to K. Hovnanian and Toll Brothers should be paid to Albert C. Barclay, Jr. and not United Jersey Bank Attorneys and that the Trust should not pay Attorneys twice.

11.  In May of 1995, the law firm of Stark and Stark had been searching for a new permanent Co-Trustee on behalf of Susan B. Walcott to replace United Jersey Bank as the May 1995 Billing Statement verifies. Several attempts had been made with commercial banks to become a permanent Co-Trustee for the Susan B. Walcott Trust. All the commercial banks rejected Susan B. Walcott's Trust under the Will of E. Stanley Barclay, (her father) because they requested full disclosure of any environmental hazards

-4-

or conditions on the properties in the Susan B. Walcott Trust. Albert C. Barclay, Jr. was retained by Susan B. Walcott, Albert C. Barclay, Jr. was working with Mitch Newman, in house counsel for K. Hovnanian who told Mr. Hamilton, from Stark and Stark to tell any and all commercial banks who wish to qualify as permanent Co-Trustee for Susan B. Walcott's Trust that the property under Option # 6 between K. Hovnanian was contaminated and a Phase One Environmental Audit had been conducted which triggered a Phase Two Environmental Audit. Both the Phase One and Phase Two Enviromental Audits had been complete in February 1995, however, Bruce Grosse never mentioned them in his April 25, 1995 above letter. Clearly, no commercial bank wanted contaminated property in their Trust Department, it should be noted that K. Hovnanian had many problems with United Jersey Bank Co-Trustee's in years past, United Jersey Bank would not agree to agreements in 1990 and 1992 with K. Hovnanian and made the beneficiaries of the E. Stanley Barclay Trusts sign waivers.

12. In May of 1995, Albert C. Barclay, Jr. was also retained by Edward S. Barclay, Jr., Susan B. Walcott's brother. United Jersey Bank was still Edward S. Barclay, Jr.'s Co-Trustee, however, United Jersey Bank did not want to be the Co-Trustee for Edward S. Barclay, Jr.'s Trust under the Will of E. Stanley Barclay any longer because of the March 1995 lawsuit. Rather than search for a new permanent Co-Trustee as his sister Susan B. Walcott did, Edward S. Barclay, Jr. and Albert C. Barclay, Jr. devised a scheme to collapse the Edward S. Barclay, Jr. Trust under the Will of E. Stanley Barclay. The idea of the property being contaminated scared off any potential commercial banks as being a new permanent Co-Trustee for Edward S. Barclay, Jr.'s Trust, leaving Albert C.

-5-

Barclay, Jr. as the only person to want the position of Co-Trustee for the Edward S. Barclay, Jr. Trust. Another reason to collapse the Edward S. Barclay, Jr. Trust as James Walcott told me, was because if Edward S. Barclay, Jr. died, the beneficiaries would be Susan B. Walcott's children James, (himself) and his sister, Anne since Edward S. Barclay, Jr. had no children. Later on, in September of 1995, Albert C. Barclay, Jr. became Limited Co-Trustee for Edward S. Barclay, Jr. under the Will of E. Stanley Barclay to sell the subject matter property to K. Hovnanian. Albert C. Barclay, Jr. as Limited Co-Trustee for Edward S. Barclay, Jr. was to hold the proceeds of the K. Hovnanian Sale until a permanent Co-Trustee was appointed. The goal to oust a permanent Co-Trustee with the idea of the property being contaminated and collaspe the Trust by using Albert C. Barclay, Jr., Edward S. Barclay, Jr.'s counsin almost worked.

13. I did not understand in mid-May 1995 why the above Barclay families, (Sellers) failed to respond to my above May 3, 1995 letter. I proceeded to send Bruce Grosse, K. Hovnanian's President a letter dated May 19, 1995. I was told by my father that, Albert C. Barclay, Jr. had scheduled a tentative meeting with K. Hovnanian on June 5, 1995 to discuss the alleged price reductions that K. Hovnanian demanded. I requested an outline of K. Hovnanian's agenda in writing before May 31, 1995 and also information that would support a price reduction of over 1 million dollars.

14. On May 23, 1995, K. Hovnanian Companies signed for my above letter dated May 19, 1995. On the same day, May 23, 1995, Bruce Grosse sent a letter in the mail to me and stated why K. Hovnanian Companies required a $1,300,000 price reduction off the contract price of $5,605,000. The information contained in the May 23, 1995 letter

by Bruce Grosse was false and misleading, however, I relied on the information as being true and proceeded to fly to New Jersey to meet with K. Hovnanian Companies on June 5, 1995. Nothing was ever written in the May 23, 1995 letter about an environmental problem or a Phase One and Phase Two Audit Report from February 1995. The basis for a $1,300,000 price reduction was high taxes in East Windsor Township.

15. As a result of K. Hovnanian's above letter dated May 23, 1995, my Dad and I reviewed the Contracts and a Contract on 5 acres known as the Toll Brother Easement. It became rather clear to us that K. Hovnanian terminated Option 6 by the terms of the May 23, 1995 K. Hovnanian proposal. We did not agree with the May 23, 1995 K. Hovnanian proposal. We had a deadline of June 1, 1995 on an Option with a company known as Toll Brothers, Inc.  to complete construction of a 5 acre easement, roads, waterlines ect.. K. Hovnanian incorporated the same Toll Brother Easement into their contract under Option # 6. When K. Hovnanian notified us they were not going to purchase our property under the terms of Option # 6,we sent a notice by certified mail and by of fax requiring Toll Brothers to purchase the option area (5 acres at a price of $50,000 per acre). We informed Toll Brother's that our contract with another party (which was K. Hovnanian) terminated. A closing for $250,000 between Toll Brothers and the Sellers should have taken place on or about August 30, 1995.

16. The above Option deadline letter we sent Toll Brothers and the other Sellers upset Albert C. Barclay, Jr. a great deal. Albert C. Barclay, Jr. told Toll Brothers we had no right to send them a letter and later in the summer of 1995, Albert C. Barclay, Jr. alleges he told Toll Brothers to pay him $36,000 and that K. Hovnanian was still going to

-7-

purchase the 95 acres. It became very clear that something was very wrong with Albert C. Barclay, Jr.'s actions. Something was being covered up and Albert C. Barclay, Jr. became very hostile from May 30, 1995 to present day. To date, Albert C. Barclay, Jr. will not answer any questions about the Toll Brother's Easement. It is not clear if Albert C. Barclay, Jr. collected $250,000 or $36,000 in the summer of 1995 from Toll Brothers and kept all of money for himself and perhaps part of the Barclay families but not the Poling family. James Walcott told me that Najarian Associates partly constructed the curbing, road and a very large drainage area on the Toll Brothers Easement for K. Hovnanian Companies. James Walcott futher stated that he reviewed the file in East Windsor Township and found that the work Najarian Completed on the Toll Brother Easement failed inspection and the curbing had to be removed and a large drainage basin had to be filled in. Because K. Hovnanian started construction on the Toll Brother Easement they were entitled to collect 11% on any money K. Hovnanian spent on construction of the Easement. Initially, the intent of the Toll Brother Easement was to give Toll Brothers access to 357 Apartments Units they never constructed on 53 acres land. Toll Brothers needed five (5) acres of our farm for an easement otherwise they were landlocked. I do not know how much money it cost K. Hovnanian/Najarian Associates to start what they never finished. I do not know how much money K. Hovnanian/Najarian Associates made collecting 11% interest from Toll Brothers, I do know that Hovnanian started construction on the easement around 1989 and Hovnanian must have collected 11% interest for several years on any money Hovnanian spent.

-8-

17. On June 5, 1995, a meeting took place at K. Hovnanian's office in New

Brunswick, New Jersey. In attendance was Len Cohen, Realtor, some of the Sellers:

Susan B. Walcott, Edward S. Barclay, Jr., Albert C. Barclay, Jr., William S. Barclay and

his son David, my mother and father and my brother Dan. I recorded the about 3 hours of

the meeting on audio tape at the request of my brother's Jack and Barclay since they

could not attend the meeting. Bruce Grosse and Mitch Newman from K. Hovnanian gave

out a spiral bound document 36 pages long entitled "Economic Evaluation Ratable Base

and Property Tax Trends, East Windsor Township, Mercer County, New Jersey". Bruce

Grosse told everyone that the basis for a $1,300,000 price reduction was because the

taxes were very high is East Windsor Township. Bruce Grosse and Mitch Newman did

not discuss anything about an Environmental Audit they had done with Najarian  in

February 1995. After a long day, some of the Sellers agreed to a minor price reduction

if K. Hovnanian agreed to close on or before the June 29, 1995 expiration of Option # 6.

18. After the June 5, 1995 above meeting, Mitch Newman in house counsel for

Hovnanian was going to Draft an outline of what was discussed on June 5, 1995 and send

it out to all parties. Rather than send out adraft of what was discussed June 5, 1995,

Albert C. Barclay, Mitch Newman and Bruce Grosse decided to change everything again

and again and again. The June 5, 1995 meeting was a scam to get the Seller's together to

understand what they knew and then see how much they could get away with.

19. On June 22, 1995, Bruce Grosse, K. Hovnanian Companies President drafted a

letter agreement that did not reflect anything that was agreed to by some parties on June

5, 1995. A few parties signed the June 22, 1995 letter agreement, I did not sign the June

-9-

22, 1995 letter agreement and several other sellers did not sign the June 22, 1995 letter agreement including United Jersey Bank, Co-Trustee of the E. Stanley Barclay Trusts for Susan B. Walcott and Edward S. Barclay, Jr.. K. Hovnanian paid no money to any seller for the June 22, 1995 letter agreement. When Bruce Grosse realized that several Sellers would not agree to his June 22, 1995 letter agreement, Mitch Newman then decided to threaten the parties who did not sign the new agreement with the idea that our farm was contaminated. K. Hovnanian agreed to clean up the contamination with its former subsidiary company Najarian Associates if the Sellers agreed to the new terms. Several sellers including myself would not agree to the terms of the June 22, 1995 letter agreement. K. Hovnanian then changed and modified the June 22, 1995 letter agreement and still several sellers would not agree. The initial estimate provided by Najarian Associates for soil remediation and removal was approx. $14,000 in July 1995, by August 1995 that figure was almost $1,000,000. K. Hovnanian was going to provide the Trucks and Najarian Associates would clean up the soil. Albert C. Barclay, Jr. said K. Hovnanian would truck the soil to Ohio and he would be in charge of overseeing everything Hovnanian and Najarian did.

20. On July 27, 1995, I video-taped and photographed the entire East Windsor farm that had been under Option 6 farm and found 3 fresh dug holes with sticks that had been marked in the 3 holes next to a steel water tank. The steel water tank was the basis and the focus of K. Hovnanian/Najarian Associates reason that the subject matter property was contaminated. I found out later that Najarian Assoc. did not test the inside the above

-10-

water tank. Many questions arose about how and why the water tank was moved from the back of the farm, (almost ½ mile) to the front of the farm. I later found out that William S. Barclay and Albert C. Barclay, Jr. had the water tank removed so no further questions could be asked to Najarian or Hovnanian. The soil test were later to be proven no accurate and the soil did not have any problem.

21. From July 27, 1995 to December 13, 1995, I had conducted an investigation on the environmental information K. Hovnanian had and in February 1996 I filed an Insurance Claim with the Travelers Insurance Company, (253 pages long with 60 Exhibits attached).Pursuant to our Contract with K. Hovnanian we had to have Insurance. I tried several times to get information on our insurance policy from Albert C. Barclay, Jr. but he would not give any information at all on the Sellers policy. I finally found out the policy # from an old document my Father had. The impact of the Insurance Policy made CEO of K. Hovnanian Enterprises, Ara K. Hovnanian, fly down to West Palm Beach, Florida and meet with my Father, Brother, Jack and myself. After we had a four hour meeting with Ara K. Hovnanian in March 1996, Ara K. Hovnanian faxed a letter to us and demanded that we drop our Insurance claim. We would not drop our Insurance claim, and K. Hovnanian Companies failed to ever provide any proof to the Travelers Insurance Company that the subject matter property was contaminated. Clearly, our insurance coverage did cover environmental matters. K. Hovnanian later wanted $410,000 because our farm was contaminated, they told us to return the Option payments they paid over 11 years of $400,000 plus $10,000 for another environmental scheme they

-11-

tried with the five (5) Barclay families. I would not agree to pay K. Hovnanian $410,000 since no proof exists K. Hovnanian ever paid $410,000 to the Sellers.

22.   On December 13, 1995, Albert C. Barclay, Jr. filed a Partition Lawsuit to partition the subject matter property that had been under Option 6 with K. Hovnanian, however, Albert C. Barclay, Jr. wanted to Partition the East Windor farm by way of a contract or letter agreement with K. Hovnanian dated June 22, 1995. The intent of the Lawsuit was to get a Commissioner to sell our farm to K. Hovnanian so we could not object to the Sale. If the five (5) Barclay families agreed to sell my land to K. Hovnanian at a reduced price then the majority would rule. As of this day I am in fear that K. Hovnanian will in fact steal my property by way of Commisioner. Today I was also threatened by Murele Huseth, (on the telephone) Presdient of the North East Division of K. Hovnanian to sell our property to K. Hovnanian Companies for around $3,000,000, the actual market value is over $6,000,000. I have offers in the range of $6,100,000 as of today.

23.   K. Hovnanian Companies does in fact control public records in the State of New Jersey. To date, K. Hovnanian Companies has controlled all information on my property in the County of Mercer and in East Windsor Township. Certain information would help prove facts that K. Hovnanian has worked hard to cover up.

FURTHER AFFIANT SAYETH NAUGHT.

_J. Clark Poling_

Sworn to before me on the _27_ day of _July_, 1998, by

J. Clark Poling.  He has presented _Drivers License_ as

_P452 443 61 707 0 (X 6/7/02)_

identification.

KERRY A. GORR
MY COMMISSION # CC 744443
EXPIRES: May 20, 2002
Bonded Thru Notary Public Underwriters

(Notarial Stamp)

_Kerry A. Gorr_
Notary Public
Name _Kerry A. Gorr_
State of: _Florida_
My Commission No.: _CC 744443_
My Commission Expires: _5/20/02_

-13-

# AFFIDAVIT
## OF J. CLARK POLING

STATE OF FLORIDA
COUNTY OF INDIAN RIVER

BEFORE ME, the undersigned authority, personally appeared J. CLARK POLING, who after being duly sworn, deposes and says:

### "THE 1946 STOCKHOLDERS AGREEMENT SCHEME"

1.  I have prepared and executed this Affidavit as a result of information given to me by James Walcott and information which I obtained through an investigation that I conducted over the past few months.

2.  On February 26, 1996, James Walcott mailed to me a copy of a Stockholders Agreement between: my Grandparents (Isaiah D. Barclay & Gladys S. Barclay); James Walcott's Grandparents:(E. Stanley Barclay & Elinor S.Barclay); Albert C. Barclay, Jr's Parents:(Albert C. Barclay & Marion T. Barclay); my Great Grandparents and also the above, brother's, Isaiah, Stanley and Albert's Parents: (Ezekiel S. Barclay & Lizzie C. Barclay) and William H. Gordon. The above parties to said Agreement are the Stockholders of a Corporation known as "Chamberlin & Barclay, Inc.". The "Trustee" of the Stockholder's Agreement is a Bank known as "THE FIRST NATIONAL BANK OF CRANBURY, NEW JERSEY".

**EXHIBIT "5"**

A copy of CHAMBERLIN & BARCLAY, INC., Stockholder's Agreement is annexed hereto as **EXHIBIT "1"**.

3. On April 29, 1996, I went to the Surrogates Court in Middlesex County, New Jersey to obtain information on Isaiah D. Barclay's Estate. No information existed in the Surrogates files, however, I was told to check the Archives near a prison in New Brunswick, New Jersey. I entered a vault in Archives and two men searched the files and found a Final Accounting filed November 22, 1972 for the Estate of Isaiah D. Barclay. The Value of Chamberlin & Barclay, Inc. was left UNDETERMINED.

4. On or about June 7, 1996, I requested information from Albert C. Barclay, Jr., Trustee under the Will of Gladys S. Barclay, (my Grandmother) and I also requested the same information from Mellon Bank, Corporate Co-Trustee under the Will of Isaiah D. Barclay, (my Grandfather). The information I was seeking was any and all Agreements that existed at the time of my Grandfather, Isaiah D. Barclay's death on January 10, 1968. To date, Mellon Bank and Albert C. Barclay, Jr. will not answer any questions about Trust assets or agreements. I have requested the Initial Tax Returns (706 Tax Return) from 1968 or 1969 that Mellon Bank (formerly Girard Trust Bank) filed, Mellon Bank Claims to have lost them.  Albert C. Barclay, Jr. claims

-2-

to be a Tax Expert Attorney who filed the 706 Tax Return
for the Gladys S. Barclay Trust in 1977, (Gladys S. Barclay
died July 29, 1977). Gladys S. Barclay exercised her power
of appointment in her Will over the Isaiah D. Barclay
Trust claiming a percentage of the Assets in the Isaiah D.
Barclay Trust. Albert C. Barclay, Jr. prepared the Tax
Returns for the Gladys S. Barclay Trust and he claims to
have lost the Initial Tax Returns for both Gladys and
Isaiah D. Barclay.

     5.  On August 27, 1996, Albert C. Barclay, Jr.
under oath told Honorable Samuel D. Lenox, Superior Court
of New Jersey Judge that, he, (Albert C. Barclay, Jr.)
never represented me, or my families Trusts at anytime
as an Attorney, however, on October 12, 1995, Albert C.
Barclay, Jr., faxed me and my three brothers a letter
claiming to be our Attorney.  I have an audio tape
which I ordered from the Superior Court in New Jersey
that confirms the above statement 08/27/96.

     6.  I thought Albert C. Barclay, Jr. had represented
me and my Trust as an Attorney and a Trustee when I was
15 years old. Mr. Barclay told me to contact my mother's
Attorney, Bill Moran if I wanted any Estate Tax Returns.

     7.  On or about December 1, 1996, I contacted William

-3-

C. Moran, Jr., Esq. and I ask him if he represented me
as an Attorney when my Grandmother (Gladys S. Barclay) died.
William C. Moran, Jr., told me that his Partner in his
Law Firm Jack Schuyler Huff and himself only represented
William S. Barclay, (my mother's brother) and my mother,
Elizabeth B. Poling, and they did not represent me or
my brothers as Attorneys at anytime. I ask Mr. Moran if
the Surrogate Court appointed me a Guardian Ad-Litem for
the Trust Gladys S. Barclay Established for me, ( I was
15 years old when my Grandmother died). Mr. Moran said
he could not remember and he would check his files.

8.  On December 23, 1996, William C. Moran, Jr., Esq.
sent me information regarding the Gladys S. Barclay Trust,
however, Mr. Moran did not send me any information on who
represented me to go over Accountings filed. Mr. Moran
and his secretary confirmed that they did have the Isaiah
D. Barclay 706 Tax Returns, however, in Mr. Moran's letter
he stated he did not. Beverly, Mr. Morans secretary told
me that William S. Barclay came into Mr. Morans office
on December 20, 1996 and demanded that Mr. Moran not send
me anything on the Isaiah D. Barclay Trust or Chamberlin
& Barclay, Inc..

-4-

9.  On or about April 25, 1997, I was helping my Mother and Father move furniture out of a house they had owned for over 40 years located on Long Beach Island, New Jersey. Most of the furniture had been Isaiah & Gladys Barclay's. We moved a large dresser that was Isaiah D. Barclay's from a second story deck, as we lowered the dresser down, the back veneer of the dresser caught on the deck railing popping part of the back veneer panel off. Two large envelopes fell out of the back of the dresser, one envelope was brown and had the words written on the front: ***Letters, ect., reference agreements.*** The other large yellow envelope contained twenty four (24) small leather diaries from 1943 to 1965, (two (2) diaries for the year 1954), each diary was Isaiah D. Barclay's.

10.  The above brown envelope that had the words written on front: ***Letters, ect., reference agreements*** had the Original Notarized Stockholders Agreements from the Corporation known as Chamberlin & Barclay, Inc.. The Stockholders Agreements dated back to January 25, 1929, the most interesting thing I found was a detailed breakdown of who owned what stock in the December 16, 1946 Stockholder Agreement, (the SAME Stockholders Agreement James Walcott sent me February 26, 1996, EXHIBIT "1").

-5-

11.  On July 25, 1997, my Mother, Father, and Brother
Dan and myself went to Susan Walcott's House in Princeton,
New Jersey and told her and her son James Walcott what
we had found when moving Isaiah D. Barclay's Dresser. James
Walcott handed my brother Dan a letter dated October 29,
1965 addressed to my Grandfather, Isaiah D. Barclay,
President of Chamberlin & Barclay, Inc., the letter was
written by James Walcott Grandparents, E. Stanley Barclay
and Elinor S. Barclay regarding the December 16, 1946
Stockholders Agreement.

12.  James Walcott told me that the December 16,
1946 Chamberlin & Barclay, Inc. Stockholders Agreement
was "The Agreement" everyone fought about for years, and
his Dad, Dexter Walcott, was the Attorney who advised
E. Stanely Barclay and Elinor S. Barclay about what to do
with the Stockholders Agreement.

13.  In the brown envelope that fell out of Isaiah
D. Barclay's dresser (described above) was a letter from
Isaiah's Attorney John P. McGrath, dated April 5, 1966.
The said letter discussed a meeting with Dexter Walcott and

-6-

Mr. Schwartz regarding a draft of a new Stockholders
Agreement between Chamberlin & Barclay, Inc. Stockholders.

14.  At our meeting July 25, 1997, with James Walcott
and Susan Walcott, James "Jimmy" said the Stockholders
of Chamberlin & Barclay, Inc. failed to ever agree on
a new Stockholders Agreement which left the December 16,
1946 Stockholders Agreement in full force and legally
binding between all parties, until his Grandfather
left Chamberlin & Barclay, Inc. in 1972.

15.  On June 12, 1967, Isaiah D. Barclay had
written a letter to Gladys S. Barclay which my Mother
found. The four page letter describes some of Isaiah
D. Barclay's Assets, it was written because he was very
sick, (six months later he died).  Clearly, at the end
of the letter, Isaiah indicates to Gladys that he had hoped
to live long enough to work things out with the Chamberlin
& Barclay, Inc., Stockholders Agreement from 12/16/46,

Letter:      *C & B –*
           *Leaving this until last as hardly know what
      to say.  As long as Father lived our business was
      wonderful. Since then it has been constant bickering.
           Shag (Albert) and Stan alike until I bought
      Shag out. Then Stan and Elinor through Dexter sued
      us. We have some kind of a STOCKHOLDERS AGREEMENT.
      Girard (now Mellon Bank) or someone will have to
      help you work it out.*

-7-

> *Had hoped to live long enough to work it out.*
> *Perhaps a sale or merger can be arranged. Perhaps*
> *Ed (Edward L. Poling) and Bill (William S. Barclay)*
> *can help you.  Always thought business might be sold*
> *locally to some good customers.  If I am spared a*
> *couple years, will try to work this out.*

16.  On January 10, 1968, Isaiah D. Barclay died of a massive heart attack.  The Chamberlin & Barclay, Inc. Stockholders Agreement dated December 16, 1946 survived, without any changes before Isaiah's death.  The reason the December 16, 1946 "C & B" Stockholders Agreement survived is because E. Stanely Barclay stayed in "C & B" until late September 1972. In fact E. Stanely Barclay owned the entire "C & B" Corporation pursuant to the terms of the 12/16/46 Stockholders Agreement.

17. Upon Isaiah D. Barclay's death, the terms of the 12/16/46 "C & B" Stockholders Agreement are described on Exhibit "1". The most important fact is when Isaiah D. Barclay died so did his wife's ownership of any stock die. Gladys S. Barclay on January 10, 1968 did not own any Chamberlin and Barclay, Inc. Stock as a result of Isaiah's death.

-6-

FURTHER AFFIANT SAYETH NAUGHT.

J. CLARK POLING

Sworn to before me on the _27th_ day of _October_

1997, by J. CLARK POLING.  He has presented _Florida Drivers Lic._

_exp 6/7/2002_ as identification.

(Notarial Stamp)

SANDRA L. GEHRKE
MY COMMISSION # CC 498980
EXPIRES: November 20, 1999
Bonded Thru Notary Public Underwriters

NOTARY PUBLIC
Name
State of Florida
My Commission No:
My Commission Expires:

—9—

Mr. James Walcott
443 Brookstone Drive
Princeton, New Jersey 08540

FIRST CLASS

Mr. J. Clark Poling
11025 138th Avenue
Fellsmere, FL  32948

UNITED STATES
POSTAL SERVICE

0000

U.S. POSTAGE
PAID
TRENTON, NJ
080 19
FEB 20, '96
AMOUNT
$0.55
0007637U-07

EXHIBIT ____

PAGE ____

THIS AGREEMENT, MADE AT CRANBURY, NEW JERSEY, ON THIS

18th DAY OF DECEMBER, 1946.

BETWEEN

WILLIAM H. GORDON,
EZEKIEL S. BARCLAY,
LIZZIE C. BARCLAY,
ISAIAH D. BARCLAY,
GLADYS S. BARCLAY,
E. STANLEY BARCLAY,
ELINOR S. BARCLAY,
ALBERT C. BARCLAY,
MARION T. BARCLAY,
(HEREINAFTER CALLED THE STOCKHOLDERS),

AND

CHAMBERLIN & BARCLAY, INC.,
(HEREINAFTER CALLED THE CORPORATION),

AND

THE FIRST NATIONAL BANK OF CRANBURY, NEW JERSEY,
(HEREINAFTER CALLED THE TRUSTEE),

WITNESSETH: IN CONSIDERATION OF THE COVENANTS AND PROMISES

HEREIN CONTAINED, IT IS HEREIN MUTUALLY COVENANTED AND AGREED

THAT:

1. EACH STOCKHOLDER SHALL FORTHWITH DEPOSIT WITH THE

TRUSTEE ALL CERTIFICATES OF STOCK OF THE CORPORATION OWNED BY

HIM OR HER, SAID CERTIFICATES TO BE ENDORSED IN BLANK AND TO

TRANSFER LEGAL TITLE THERETO TO THE TRUSTEE.

2. A STOCKHOLDER WHO WISHES TO SELL HIS STOCK WHILE

LIVING MUST SELL IT TO THE CORPORATION, WHICH HEREBY AGREES TO

PURCHASE SAID STOCK. THE SALE SHALL BE EFFECTIVE IMMEDIATELY

UPON SAID STOCKHOLDER'S GIVING TO THE CORPORATION WRITTEN NOTICE

OF HIS OR HER INTENTION TO SELL. THE PURCHASE PRICE SHALL BE

EIGHTY (80) PERCENT OF THE BOOK VALUE OF SAID STOCK AS

DETERMINED BY THE NEXT ANNUAL AUDIT. THE STOCK SHALL BE PAID

FOR AS FOLLOWS:



EXHIBIT _____

PAGE _____

(A) ONE-THIRD ON THE FIRST DAY OF THE YEAR FOLLOWING THE SALE.

(B) THE BALANCE OF THE PURCHASE PRICE SHALL BE PAID IN FIVE, EQUAL, ANNUAL PAYMENTS ON THE FIRST DAY OF EACH SUCCEEDING YEAR.  THESE FIVE PAYMENTS SHALL BE SECURED BY CORPORATION NOTES BEARING FOUR (4) PERCENT INTEREST FROM THE FIRST DAY OF THE YEAR FOLLOWING THE SALE; PROVIDED, THAT THE CORPORATION, AT ITS OPTION, MAY MAKE PAYMENTS BEFORE THEY BECOME DUE, AND IN THAT EVENT SHALL BE LIABLE ONLY FOR INTEREST TO THE DATE OF PAYMENT.

3.  IN THE EVENT OF THE DEATH OF A STOCKHOLDER, THE STOCK OF THE DECEASED STOCKHOLDER SHALL BE PURCHASED BY THE CORPORATION FOR EIGHTY (80) PERCENT OF ITS BOOK VALUE AS DETERMINED BY THE CERTIFIED AUDIT MADE AT THE END OF THE YEAR DURING WHICH THE DEATH OCCURS.  GOOD-WILL SHALL NOT BE CONSIDERED IN EVALUATING THE STOCK OF THE CORPORATION.  INSURANCE CARRIED BY THE CORPORATION ON THE LIFE OF A STOCKHOLDER SHALL NOT ENHANCE THE VALUE OF DECEDENT'S STOCK, BUT SHALL BE AN ASSET OF THE SURVIVING STOCKHOLDERS.  IN THE EVENT OF DEATH OF A STOCKHOLDER, THE CORPORATION SHALL PAY FOR THE STOCK OF THE DECEASED STOCKHOLDER AS FOLLOWS:

(A) THE PROCEEDS FROM INSURANCE POLICIES CARRIED BY THE CORPORATION UPON THE LIFE OF THE DECEASED STOCKHOLDER SHALL BE PAYABLE TO THE DECEDENT'S ESTATE WHEN COLLECTED.

(B) THE BALANCE OF THE PURCHASE PRICE SHALL BE PAID IN TEN, EQUAL, ANNUAL INSTALLMENTS, THE FIRST PAYMENT BEING DUE ON THE FIRST DAY OF THE YEAR FOLLOWING THE YEAR IN WHICH THE DEATH OCCURS.  ANOTHER PAYMENT SHALL BE DUE ON THE FIRST DAY OF EACH SUCCEEDING NINE YEARS, AND THESE NINE PAYMENTS SHALL BE SECURED BY CORPORATION NOTES BEARING FOUR (4) PERCENT INTEREST FROM THE

EXHIBIT "A"

PAGE 3

FIRST DAY OF THE YEAR FOLLOWING THE YEAR IN WHICH THE DEATH OCCURS; PROVIDED, THAT THE CORPORATION, AT ITS OPTION, MAY MAKE PAYMENTS BEFORE THEY BECOME DUE, AND IN THAT EVENT SHALL BE LIABLE FOR INTEREST ONLY TO THE DATE OF PAYMENT.

4. UPON THE DEATH OF HER HUSBAND THE SHARES OF STOCK HELD BY ANY WOMAN STOCKHOLDER SHALL BE SOLD TO THE CORPORATION UNDER THE TERMS OF THIS AGREEMENT AS IF SHE HAD DIED WITH HER HUSBAND, IT BEING THE INTENTION OF THIS AGREEMENT THAT NO WIFE SHALL HOLD STOCK AFTER THE DEATH OF HER HUSBAND.

5. THE BOOKS OF THE CORPORATION SHALL BE AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AT THE END OF EACH CALENDAR YEAR, AND THIS AUDIT SHALL BE THE BASIS UPON WHICH SHALL BE DETERMINED THE PER SHARE VALUE OF THE STOCK OF THE CORPORATION. SUCH AUDITORS AS ARE NECESSITATED BY THIS AGREEMENT SHALL BE CHOSEN BY THE TRUSTEE, WHOSE DECISION SHALL BE FINAL.

6. THIS AGREEMENT SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THERE SHALL BE FILED WITH THE TRUSTEE A REQUEST TO TERMINATE THIS AGREEMENT SIGNED BY TWO-THIRDS OF THE STOCKHOLDERS.

7. THIS AGREEMENT SHALL BIND AND BENEFIT THE PARTIES HERETO, THEIR HEIRS, LEGAL REPRESENTATIVES, SUCCESSORS AND ASSIGNS.



EXHIBIT "1"

PAGE 4

IN WITNESS WHEREOF, THE STOCKHOLDERS HAVE HEREUNTO SET THEIR HANDS AND SEALS, AND CHAMBERLIN & BARCLAY, INC., AND THE FIRST NATIONAL BANK OF CRANBURY, NEW JERSEY, HAVE CAUSED THESE PRESENTS TO BE EXECUTED BY THEIR PROPER OFFICERS, AND THEIR CORPORATE SEALS TO BE HERETO AFFIXED, THE DAY AND YEAR FIRST ABOVE WRITTEN.

........................(L.S.)
EZEKIEL S. BARCLAY

SIGNED, SEALED AND
DELIVERED IN THE
PRESENCE OF

........................(L.S.)
LIZZIE C. BARCLAY

ALMA M. F. STULTS
NOTARY PUBLIC
My Commission expires on Dec. 1, 1948

........................(L.S.)
WILLIAM H. GORDON

........................(L.S.)
ISAIAH D. BARCLAY

........................(L.S.)
GLADYS B. BARCLAY

........................(L.S.)
E. STANLEY BARCLAY

........................(L.S.)
ELINOR S. BARCLAY

........................(L.S.)
ALBERT C. BARCLAY

........................(L.S.)
MARION T. BARCLAY

ATTEST:

CHAMBERLIN & BARCLAY, INC.

BY:........................
E. S. BARCLAY, PRESIDENT

E. STANLEY BARCLAY,
SECRETARY

ATTEST:

FIRST NATIONAL BANK OF CRANBURY, N. J.

BY:........................
ISAIAH D. BARCLAY, VICE-PRESIDENT

LESLIE W. PERRINE,
SECRETARY

EXHIBIT "1"

PAGE 5

# CIVIL COVER SHEET

98 - 8670

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

CIV-FERGUSON

MAGISTRATE JUDGE

SNOW

**I. (a) PLAINTIFFS**
J. CLARK POLING
JOHN C. POLING

**DEFENDANTS**
ADA HOUNISH, COHEN, TOLL BROS, MELLON BANK, PNC BANK, CHARLES BRIGGS, BARCLAY TR, ESTATE E. STANLENG, JOHN D... INCORPORATED IN DELAWARE

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  INDIAN RIVER
(EXCEPT IN U.S. PLAINTIFF CASES)  FLORIDA

98 CV 8670 / FERGUSON - SNOW

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES  USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

ATTORNEYS (IF KNOWN)  SUSAN ACCETT, SUMMIT PARTNERS, WILLIAM B BARCLAY, BARCLAY TRUST, I.O. BARCLAY, PAUL DEBRIGS, HUFF, M-NAB, JOHN DUSH...

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  (PALM BEACH)  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE  HIGHLANDS

## II. BASIS OF JURISDICTION   (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF (For Diversity Cases Only) AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | B☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | B☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | **PERSONAL INJURY** | B☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 362 Personal Injury Med. Malpractice | B☐ 640 R.R. & Truck | **A PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 365 Personal Injury Product Liability | B☐ 650 Airline Regs | ☐ 820 Copyrights | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 320 Assault, Libel & Slander | B☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 330 Federal Employers Liability | B☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/Exchange |
| ☐ 368 Asbestos Personal Injury Product Liability | ☐ 340 Marine | | | ☐ 875 Customer Challenge 12 USC 3410 |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **A LABOR** | **B SOCIAL SECURITY** | ☐ 891 Agricultural Acts |
| ☐ 160 Stockholders' Suits | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 892 Economic Stabilization Act |
| ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 862 Black Lung (923) | ☐ 893 Environmental Matters |
| ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 894 Energy Allocation Act |
| | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 210 Land Condemnation | ☐ 441 Voting | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 950 Constitutionality of State Statutes |
| ☐ 220 Foreclosure | ☐ 442 Employment | B☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 890 Other Statutory Actions |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | **HABEAS CORPUS:** | | A OR B | |
| ☐ 240 Torts to Land | ☐ 444 Welfare | B☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | A☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 535 Death Penalty | | | |
| ☐ 290 All Other Real Property | | B☐ 540 Mandamus & Other | | | |
| | | B☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

(18 U.S.C. 1962(a)(b)(c)(d)) DEFENDANTS HAVE PARTICIPATED IN A CONTINUING SCHEME TO EMBEZZLE TRUST & PARTNERSHIP ASSETS HELD BY FIDUCIARIES FOR PLAINTIFFS BEHALF

LENGTH OF TRIAL via ___ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION** ☐ UNDER F.R.C.P. 23

DEMAND $ ___

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES   ☐ NO

## VIII. RELATED CASE(S)   (See instructions)
IF ANY

JUDGE ___   DOCKET NUMBER ___

DATE  9-23-98

SIGNATURE OF ATTORNEY OF RECORD  John C Pol... Pro Se

**FOR OFFICE USE ONLY**

RECEIPT #  205252   AMOUNT  $150.00   APPLYING IFP ___   JUDGE  FERGUSON   MAG. JUDGE  SNOW